STATE OF MINNESOTA

IN SUPREME COURT

A12-1930
A12-2092

Court of Appeals                                                        Stras, J.


Patrick Finn and Lighthouse Management
Group, Inc.,

                    Appellants/
                    Cross-Respondents,

vs.                                                        Filed:  February 18, 2015
                                                          Office of Appellate Courts
Alliance Bank,

                    Respondent/
                    Cross-Appellant,

Home Federal Bank,

                    Respondent/
                    Cross-Appellant,

KleinBank,

                    Respondent/
                    Cross-Appellant,

Merchant's Bank,

                    Respondent/
                    Cross-Appellant,

M&I Marshall & Ilsley Bank,

                    Respondent/
                    Cross-Appellant,

1

American Bank of St. Paul et al.,

Defendants.

_____

Larry B. Ricke, Karl E. Robinson, Sweeney & Masterson, P.A., Saint Paul, Minnesota, and William M. Hart, Meagher & Geer, P.L.L.P., Minneapolis, Minnesota for appellants/cross-respondents Patrick Finn and Lighthouse Management Group, Inc.

Christopher R. Morris, Bassford Remele, P.A., Minneapolis, Minnesota, for respondent Alliance Bank.

Kevin M. Decker, Benjamin E. Gurstelle, Briggs and Morgan, P.A., Minneapolis, Minnesota, for respondent/cross-appellant Home Federal Bank.

Shari L.J. Aberle, Andrew Brattingham, Dorsey & Whitney LLP, Minneapolis, Minnesota, for respondent/cross-appellant KleinBank.

Mark A. Merchlewitz, Benson & Merchlewitz, Winona, Minnesota, for respondent/cross-appellant Merchant's Bank.

Keith S. Moheban, Peter J. Schwingler, Katherine E. Devlaminck, Stinson Leonard Street LLP, Minneapolis, Minnesota, for respondent/cross-appellant M&I Marshall & Ilsley Bank.

Richard T. Thomson, Lapp, Libra, Thomson, Stoebner & Pusch, Chartered, Minneapolis, Minnesota, and Kevin D. Hofman, Halleland Habicht P.A., Minneapolis, Minnesota, for amici curiae City National Bank et al.

Paul L. Ratelle, Fabyanske Westra Hart & Thomson, Minneapolis, Minnesota, and Karen E. Wagner, Andrew S. Gehring, Davis Polk & Wardwell LLP, New York, New York, attorneys for amicus curiae The Clearing House Association L.L.C.

Thomas H. Boyd, Michael A. Rosow, Jacob B. Sellers, Winthrop & Weinstine, P.A., Minneapolis, Minnesota, and H. Peter Haveles, Jr., Kaye Scholer LLP, New York, New York, and James P. Conway, Jaspers, Moriarty & Walburg, P.A., Shakopee, Minnesota, and Tobias S. Keller, Keller & Benvenutti LLP, San Francisco, California, and Joseph G. Petrosinelli, Jonathan M. Landy, Christopher J. Mandernach, Williams & Connolly LLP, Washington, D.C., attorneys for amici curiae DZ Bank AG et al.

James J. White, University of Michigan Law School, Ann Arbor, Michigan, and David Woll, Michael Freedman, Isaac Rethy, Simpson Thacher & Bartlett LLP, New York, New York, and Bruce J. Douglas, Ogletree, Deakins, Nash, Smoak & Stewart, P.C., Minneapolis, Minnesota, attorneys for amicus curiae JPMorgan Chase Bank, N.A.

Bruce Jones, Stephen M. Mertz, Jerome A. Miranowski, Julie R. Landy, Faegre Baker Daniels LLP, Minneapolis, Minnesota, attorneys for amicus curiae Minnesota Defense Lawyers Association.

Steven E. Wolter, Kelley & Wolter & Scott, P.A., Minneapolis, Minnesota, and Connie A. Lahn, David E. Runck, Fafinski Mark & Johnson, P.A., Eden Prairie, Minnesota, attorneys for amici curiae Douglas A. Kelley, as Chapter 11 Trustee and the Official Committee of Unsecured Creditors of Petters Company, Inc. and Petters Group Worldwide, LLC.

_____

### S Y L L A B U S

1.  Minnesota's Uniform Fraudulent Transfer Act ("MUFTA"), Minn. Stat. §§ 513.41-.51 (2014), does not contain a "Ponzi-scheme presumption."

2.  The limitations period applicable to MUFTA claims based on actual fraud "shall not be deemed to have accrued until the discovery by the aggrieved party of the facts constituting the fraud," Minn. Stat. § 541.05, subd. 1(6) (2014).

Affirmed.

### O P I N I O N

STRAS, Justice.

This case requires us to decide two questions of first impression under Minnesota's Uniform Fraudulent Transfer Act ("MUFTA"), Minn. Stat. §§ 513.41-.51 (2014).  The first question is whether the so-called "Ponzi-scheme presumption," adopted by a number of federal courts, applies to claims brought under MUFTA.  On that

question, the court of appeals divided the Ponzi-scheme presumption into three separate components, each of which relates to an element of a MUFTA claim. The court held that a Ponzi-scheme operator acts with fraudulent intent and is insolvent as a matter of law when it makes "interest" or "profit" payments to investors, but it rejected the presumption that a Ponzi-scheme operator can never receive "reasonably equivalent value" for those payments. We agree with the court of appeals' conclusion on the inapplicability of the reasonably-equivalent-value component of the Ponzi-scheme presumption, but conclude that the fraudulent-intent and insolvency components also lack support in MUFTA.

The second question is whether the statute of limitations governing claims "for relief on the ground of fraud," Minn. Stat. § 541.05, subd. 1(6) (2014), or the one governing claims "upon a liability created by statute," Minn. Stat. § 541.05, subd. 1(2), applies to MUFTA claims. On that question, the court of appeals adopted a bifurcated approach. For MUFTA claims based on "constructive fraud," the court applied the statute of limitations for claims "upon a liability created by statute," whereas for MUFTA claims based on "actual fraud," it applied the statute of limitations for claims "for relief on the ground of fraud." Because we conclude that the Receiver's complaint fails to adequately allege a claim of constructive fraud, we consider only the limitations period applicable to actual-fraud claims. For those claims, we agree with the court of appeals that the statute governing claims "for relief on the ground of fraud" applies. Accordingly, we affirm the decision of the court of appeals as modified and remand to the district court for further proceedings consistent with this opinion.

4

# I.

This case involves the largely fraudulent lending operations of First United Funding, LLC ("First United"), an entity controlled by Corey N. Johnston. First United acted as a conduit between borrowers and lenders by making loans to borrowers and then selling "participation" interests in those loans to financial institutions. Beginning in 2002, First United began selling participation interests that exceeded the amount of the underlying loans ("oversold participations"), or that did not rest on any underlying loans at all ("fictitious participations"). Even after 2002, however, not all of the participation interests sold by First United were fraudulent.

The respondents in this case, which include Home Federal Bank, Klein Bank, Merchant's Bank, M&I Marshall & Ilsley Bank (collectively "the Respondent Banks"), and Alliance Bank, each purchased participation interests from First United that were real, not fraudulent. Nevertheless, First United commingled funds from its legitimate participation interests with those that were fraudulent. Consequently, First United financed many of its payouts to earlier "investors" at least in part through the payments made by later "investors," according to a structure commonly known as a "Ponzi scheme."

The scheme unraveled in September 2009, when two banks sued First United and asked the court to appoint a receiver. The district court appointed appellants/cross-respondents Patrick Finn and Lighthouse Management Group (collectively "the Receiver") to recover and liquidate First United's remaining assets and to distribute them to the victims of First United's scheme. The district court later expanded the scope of the

5

Receiver's duties, authorizing it to pursue claims against third parties. For his part in the scheme, Johnston pleaded guilty in September 2010 to federal charges of bank fraud and filing a false tax return.

The Receiver commenced this action in May 2011, seeking to claw back payments made by First United, before its collapse, to various financial institutions, including Alliance Bank and the Respondent Banks. The Receiver alleged in its complaint that the payments made by First United were voidable under MUFTA, both as actually fraudulent transfers, Minn. Stat. § 513.44(a)(1), and as constructively fraudulent transfers, Minn. Stat. §§ 513.44(a)(2), 513.45(a).

The allegations against Alliance Bank were based on its purchase of a participation interest in a $3.18 million loan made to Jerry Moyes, an Arizona businessman. The loan was real, not fictitious, and it was not oversold. First United renewed the loan to Moyes several times until he paid it in full by June 2007. Over the life of the loan, First United paid roughly $4.3 million to Alliance Bank, or approximately $1.2 million more than the principal amount of the loan.

According to the complaint, each of the Respondent Banks purchased participation interests between 2002 and 2004 in one or more loans, each of which the borrower paid in full approximately one year later. The last month in which any of the Respondent Banks received a principal or interest payment from First United was March 2005. First United paid the Respondent Banks sums beyond the principal amounts of the underlying loans, resulting in profits ranging from $78,000 to roughly $338,000. The participation interests of the Respondent Banks were neither fictitious nor oversold.

6

Alliance Bank and the Respondent Banks moved to dismiss the Receiver's complaint under Minn. R. Civ. P. 12.02(e), arguing both that the Receiver failed to bring the action in a timely fashion and to state claims upon which relief could be granted. The district court concluded that the 6-year statute of limitations for actions "upon a liability created by statute" applied to the Receiver's claims. Minn. Stat. § 541.05, subd. 1(2). Accordingly, it dismissed the claims brought against the Respondent Banks, none of which had received a payment from First United after March 2005. It also dismissed the claims against Alliance Bank to the extent they arose from transfers made prior to May 12, 2005—exactly 6 years before the filing of the Receiver's complaint.

The court also concluded, however, that the Receiver had pleaded legally sufficient claims against each of the financial institutions that had participated in First United's loan-participation scheme. The court based its conclusion in part on a "Ponzi-scheme presumption," which the court described as a rule providing that "the profits that good-faith investors enjoy in connection with a Ponzi scheme are recoverable as fraudulent transfers." Accordingly, it allowed the remaining claims against Alliance Bank to proceed.

Following discovery, both the Receiver and Alliance Bank moved for summary judgment. The district court granted the Receiver's motion and denied Alliance Bank's motion, again relying on the Ponzi-scheme presumption. The court entered judgment in favor of the Receiver for $1,235,388.

The Receiver appealed the district court's dismissal of its claims against the Respondent Banks. It argued that the applicable limitations period is provided by Minn.

7

Stat. § 541.05, subd. 1(6), which applies to claims "for relief on the ground of fraud" and provides a 6-year period that only begins to run upon "the discovery by the aggrieved party of the facts constituting the fraud." For its part, Alliance Bank appealed the district court's decision granting summary judgment to the Receiver, asserting that MUFTA does not contain a Ponzi-scheme presumption and that it gave reasonably equivalent value in exchange for the transfers from First United. The court of appeals consolidated the two appeals. *Finn v. Alliance Bank*, 838 N.W.2d 585 (Minn. App. 2013).

With respect to the Receiver's appeal, the court of appeals relied on our decision in *McDaniel v. United Hardware Distributing Co.*, 469 N.W.2d 84 (Minn. 1991), to hold that the applicable statute of limitations under MUFTA depends on whether a claim is based on actual or constructive fraud. *Finn*, 838 N.W.2d at 594-95. Because the common law recognized claims for actual fraud, the court reasoned, they were not "liabilit[ies] created by statute," even though the Receiver brought its claims under a statute. *Id.* at 595. Instead, the court treated such claims as seeking "relief on the ground of fraud" and accruing only upon the discovery by the Receiver of the facts constituting the fraud. *Id.* In contrast, because constructive-fraud claims did not exist at common law, according to the court, it treated those claims as involving "liabilit[ies] created by statute," which accrued on the date when First United made the allegedly fraudulent payments to each financial institution. *See id.* at 591-96.

With regard to Alliance Bank's appeal, the court of appeals divided the Ponzi-scheme presumption into three components. *Id.* at 598. It concluded the first two components—that a person or entity running a Ponzi scheme has actual intent to defraud

8

and that a Ponzi scheme is presumptively insolvent—are consistent with MUFTA. *Id.* at 598-601. But it concluded that the third component—that payments to investors in a Ponzi scheme are never for reasonably equivalent value—was unfounded, at least in the case of Alliance Bank. *Id.* at 601-03. Accordingly, the court directed the district court to enter summary judgment in favor of Alliance Bank on remand. *Id.* at 604. Even though it had rejected the third component of the Ponzi-scheme presumption, the court further concluded that the Receiver had sufficiently pleaded its actual-fraud claims against the Respondent Banks. *Id.* at 603-604. We subsequently granted the separate petitions for review filed by the Receiver and the Respondent Banks.

## II.

The first question presented in this case is whether the so-called "Ponzi-scheme presumption" applies to claims brought under MUFTA, Minn. Stat. §§ 513.41-.51 (2014). Whether MUFTA contains such a presumption is a question of statutory interpretation that we review de novo. *See Citizens State Bank Norwood Young Am. v. Brown*, 849 N.W.2d 55, 60 (Minn. 2014).

## A.

Designed to "prevent debtors from placing property that is otherwise available for the payment of their debts out of the reach of their creditors," *id.*, MUFTA allows creditors to recover assets that debtors have fraudulently transferred to third parties. To cover the variety of situations in which debtors may attempt to place assets beyond the reach of creditors, MUFTA allows creditors to recover assets that a debtor transfers with

9

fraudulent intent, Minn. Stat. § 513.44(a)(1), as well as those transfers that the law treats as constructively fraudulent, *see* Minn. Stat. §§ 513.44(a)(2), 513.45.

The former type, typically referred to as a claim of actual fraud, requires a creditor to prove that the debtor made the transfer with the "actual intent to hinder, delay, or defraud any creditor of the debtor." Minn. Stat. § 513.44(a)(1); *see also Neubauer v. Cloutier*, 265 Minn. 539, 544 n.4, 122 N.W.2d 623, 628 n.4 (1963) ("A creditor who assails a conveyance of his debtor for fraud must show it."). Because actual intent to defraud a creditor is "rarely susceptible of direct proof," we recently explained that a creditor may rely on various "badges of fraud," such as whether a transfer was made to an "insider" and whether the transfer was "disclosed or concealed," Minn. Stat. § 513.44(b), to prove a debtor's fraudulent intent. *Citizens State Bank*, 849 N.W.2d at 60. Once a creditor has proven that the debtor made a transfer with fraudulent intent, the transferee may still defeat liability by establishing the affirmative defense in Minn. Stat. § 513.48, which protects transferees "who took [the transfer] in good faith and for a reasonably equivalent value." Minn. Stat. § 513.48(a). Otherwise, the creditor is entitled to "recover judgment for the value of the asset transferred, . . . or the amount necessary to satisfy the creditor's claim, whichever is less," against the transferee. Minn. Stat. § 513.48(b).

The other type, typically referred to as a claim of constructive fraud, does not require proof of fraudulent intent. Rather, it requires a creditor to prove that

the debtor made the transfer or incurred the obligation: . . .

> (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

> (i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

> (ii) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

Minn. Stat. § 513.44(a)(2); *see also id.* § 513.45(a) (stating that a transfer is fraudulent "as to a creditor whose claim arose before the transfer was made" if there was no "reasonably equivalent value" for the transfer and "the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer"). Thus, a claim for constructive fraud turns on a creditor's ability to show that the debtor made the transfer "without receiving reasonably equivalent value," and that the debtor was insolvent, or the transfer made the debtor insolvent or unable to pay its debts. *See* Minn. Stat. §§ 513.42, 513.44(a)(2), 513.45(a).

The Receiver asks us to recognize a "Ponzi-scheme presumption," by which a creditor could prove certain elements of a fraudulent-transfer claim simply by establishing that the debtor operated a Ponzi scheme and that the transfers were made "in furtherance of the scheme." *Perkins v. Haines*, 661 F.3d 623, 626 (11th Cir. 2011). As the court of appeals recognized, the Ponzi-scheme presumption actually consists of three separate presumptions. *Finn*, 838 N.W.2d at 598. The first is that it conclusively establishes that the debtor had fraudulent intent, which means that it treats all transfers

11

from a Ponzi scheme as actually fraudulent. *See Donell v. Kowell*, 533 F.3d 762, 777 (9th Cir. 2008) (" '[T]he mere existence of a Ponzi scheme is sufficient to establish actual intent' to defraud." (quoting *In re AFI Holding, Inc.*, 525 F.3d 700, 704 (9th Cir. 2008))); *SEC v. Res. Dev. Int'l, LLC*, 487 F.3d 295, 301 (5th Cir. 2007) (stating that proof that the debtor operated a Ponzi scheme "establishes the fraudulent intent behind the transfers it made").

The other two presumptions would conclusively establish constructive fraud. First, the mere existence of a Ponzi scheme would prove as a matter of law that the debtor was "insolvent" at the time of a disputed transfer, regardless of the transfer's timing and the actual operations of the debtor. *See, e.g.*, *Wiand v. Lee*, 753 F.3d 1194, 1201 (11th Cir. 2014) (stating that Ponzi schemes "are insolvent and become more insolvent with each investor payment"); *Warfield v. Byron*, 436 F.3d 551, 558 (5th Cir. 2006) (declaring that a Ponzi scheme is, "as a matter of law, insolvent from its inception"). Second, a court would be required to presume that any transfer from a Ponzi scheme was not for reasonably equivalent value, which would both establish the second requirement of a constructive-fraud claim and negate the statutory defense to an actual-fraud claim. *See, e.g.*, *Donell*, 533 F.3d at 777-78 (holding that any payments above "the innocent investor's initial outlay" are not based on a " 'reasonably equivalent' exchange"); *In re Whaley*, 229 B.R. 767, 775 (Bankr. D. Minn. 1999) ("A payment made *solely* for the benefit of a third party, such as a payment to satisfy a third party's debt, does not furnish reasonably-equivalent value to the debtor."). Stated differently, the Ponzi-scheme presumption, by operation of its three components, allows a creditor to bypass the proof

12

requirements of a fraudulent-transfer claim by showing that the debtor operated a Ponzi scheme and transferred assets "in furtherance of the scheme." *Perkins*, 661 F.3d at 626.

Notably, however, MUFTA neither mentions nor defines a "Ponzi scheme," a label coined from a fraud perpetrated by Charles Ponzi, who had promised Boston investors in the 1920s a 50-percent return for lending him money over a 90-day period, ostensibly to purchase international-postage coupons. *See Cunningham v. Brown*, 265 U.S. 1, 7 (1924). As it turned out, Ponzi was using funds paid by later investors to provide the returns promised to early investors, which eventually earned him 5 years in prison for mail fraud. *See Ponzi v. Fessenden*, 280 F. 1022, 1022 (1st Cir. 1922). Although the moniker "Ponzi scheme" generally refers to a financial arrangement similar to the one operated by Charles Ponzi, even those courts that have recognized a Ponzi-scheme presumption have struggled to define its scope, in no small part due to the multitude of different forms that a fraudulent-investment scheme can take.

> [T]here is no precise definition of a Ponzi scheme and courts look for a general pattern, rather than specific requirements. "[T]he label 'Ponzi scheme' has been applied to any sort of inherently fraudulent arrangement under which the debtor-transferor must utilize after-acquired investment funds to pay off previous investors in order to forestall disclosure of the fraud."

*In re Manhattan Inv. Fund Ltd.*, 397 B.R. 1, 12 (Bankr. S.D.N.Y. 2007) (quoting *In re Bayou Grp., LLC*, 362 B.R. 624, 633 (Bankr. S.D.N.Y. 2007)).

In this case, the district court found that First United operated a Ponzi scheme because several "hallmark[s]" of such a scheme were present, including the "need[]" for First United to oversell loan participations in order "to repay earlier borrowers," and the

fact that "First United was insolvent from 2002 through 2009." No party challenges the district court's finding that First United operated a Ponzi scheme. Instead, the disagreement is about the legal significance of that finding.

MUFTA does not contain a provision allowing a court to presume anything based on the mere existence of a Ponzi scheme. The word "Ponzi" does not appear in the Minnesota Statutes, and MUFTA does not address "schemes." Rather, MUFTA addresses a "transfer made or obligation incurred by a debtor," Minn. Stat. §§ 513.44(a), 513.45(a), which indicates that the focus of the statute is on individual transfers, rather than a pattern of transactions that are part of a greater "scheme." MUFTA's emphasis on individual transactions finds support in the definition of the word "transfer," which refers to "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with *an asset or an interest in an asset*, and includes payment of money, release, lease, and creation of a lien or other encumbrance." Minn. Stat. § 513.41(12) (emphasis added). The asset-by-asset and transfer-by-transfer nature of the inquiry under MUFTA requires a creditor to prove the elements of a fraudulent transfer with respect to each transfer, rather than relying on a presumption related to the form or structure of the entity making the transfer. *See* Minn. Stat. § 513.41(6), (9) (defining a "debtor" as "a person who is liable on a claim," and a "person," in turn, as any "individual, partnership, corporation, association, organization, government or governmental subdivision or entity, business trust, estate, trust, or any other legal or commercial entity").

14

1.

Like the court of appeals, we will examine each of the three components of the Ponzi-scheme presumption to determine whether any of the three finds support in MUFTA. The first component, as stated above, requires a court to presume—conclusively, as the Receiver would have it—that fraudulent intent accompanies all transfers in furtherance of a Ponzi scheme. The Receiver argues that such a presumption is justified by the nature of a Ponzi scheme, in which, it claims, the scheme's operator invariably intends to cheat all investors.

Even if there is evidence to support the inference that Ponzi-scheme operators generally intend to defraud investors, MUFTA does not contain a provision allowing a court to presume fraudulent intent. Instead, MUFTA contains a list of factors, commonly referred to as "badges of fraud," that a court may consider to determine whether a debtor made a transfer with an actual intent to defraud creditors. *See* Minn. Stat. § 513.44(b). That "the debtor was involved in a Ponzi scheme" is not among them. To be sure, the list of badges of fraud is not exclusive, *see id.* (stating that "consideration may be given, among other factors, to" the badges of fraud), so a court could consider a debtor's operation of a Ponzi scheme if such a fact is properly alleged and supported. But the Legislature's enumeration of a specific list of badges of fraud, none of which are conclusive, precludes an interpretation that it intended a *non-enumerated* badge of fraud to be *conclusive*. *Cf. In re Welfare of J.B.*, 782 N.W.2d 535, 543 (Minn. 2010) (discussing the canon "*expressio unius est exclusio alterius*," that "the expression of one thing is the exclusion of another").

15

Thus, although a court could make a "rational inference" from the existence of a Ponzi scheme that a particular transfer was made with fraudulent intent, *Finn*, 838 N.W.2d at 599, there is no statutory justification for relieving the Receiver of its burden of proving—or for preventing the transferee from attempting to disprove—fraudulent intent. Instead, fraudulent intent must be determined in light of the facts and circumstances of each case. *See, e.g.*, *Prod. Credit Ass'n of Midlands v. Shirley*, 485 N.W.2d 469, 472-73 (Iowa 1992); *Myers Dry Goods Co. v. Webb*, 181 S.W.2d 56, 58 (Ky. 1944); *Stein v. Brown*, 480 N.E.2d 1121, 1124 (Ohio 1985); *see also Citizens State Bank*, 849 N.W.2d at 65 (noting that whether a transfer is made with fraudulent intent is ordinarily a question of fact).

2.

Turning to constructive-fraud claims under MUFTA, the second component of the Ponzi-scheme presumption would require a court to presume—again, conclusively as the Receiver would have it—that a debtor who operates a Ponzi scheme is insolvent when it transfers assets. MUFTA contains two formulations of constructive fraud, one that applies to "a creditor whose claim arose before the transfer was made," Minn. Stat. § 513.45(a), and the other to the claim of a creditor that "arose before or after the transfer was made." Minn. Stat. § 513.44(a)(2).

The first formulation, under Minn. Stat. § 513.45(a), turns on whether, when the transfer occurred, the debtor was or had become "insolvent," which is a term of art with a defined meaning under MUFTA. According to MUFTA, "[a] debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets, at a fair valuation."

16

Minn. Stat. § 513.42(a). MUFTA *does* contain a presumption that allows a court to conclude that a debtor is insolvent, but the presumption does not depend on the existence of a Ponzi scheme. Rather, "[a] debtor who is generally not paying debts as they become due is presumed to be insolvent." Minn. Stat. § 513.42(b). The Receiver would have us add a second presumption to MUFTA—one based largely on policy grounds—for debtors that operate Ponzi schemes. However, to do so, we would have to add language to MUFTA, something we cannot do. *See Frederick Farms, Inc. v. Cnty. of Olmsted*, 801 N.W.2d 167, 172 (Minn. 2011) (stating that we cannot "add words to a statute 'that are purposely omitted or inadvertently overlooked' by the Legislature" (quoting *Premier Bank v. Becker Dev., LLC*, 785 N.W.2d 753, 760 (Minn. 2010))).

The second statutory formulation, which applies to claims that "arose before or after the transfer was made," Minn. Stat. § 513.44(a), features different measures of financial distress. Specifically, rather than focusing on insolvency, a constructive-fraud claim under section 513.44(a)(2) turns, in part, on proof that the debtor

> (i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

> (ii) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

Minn. Stat. § 513.44(a)(2). The Receiver urges us to apply the second component of the Ponzi-scheme presumption to claims arising under section 513.44(a)(2), even though the inquiry under that provision is only indirectly related to the debtor's insolvency. With

17

limited exceptions, federal courts usually have applied the presumption to both formulations of constructive fraud. *See, e.g., Donell*, 533 F.3d at 770-71.

As with the first statutory formulation, however, the Receiver's argument on the second formulation lacks textual support. MUFTA requires courts to determine whether the debtor fit within either of the two financial-distress measures in Minn. Stat. § 513.44(a)(2), *at the time the transfer was made*. *See* Minn. Stat. § 513.44(a)(2). As a practical matter, even if we were to assume that every entity operating a Ponzi scheme becomes insolvent by the time it is subject to one or more fraudulent-transfer claims, such an assumption still would not prove that such an entity was insolvent at the time it transferred its assets. The temporal element is important because, as a factual matter, it is not at all clear that every fraudulent investment arrangement that is later determined to be a Ponzi scheme necessarily will have been insolvent from its inception. For example, it is not hard to imagine a debtor that begins as a legitimate business and eventually turns to fraud, which the Respondent Banks insist occurred here. Similarly, a debtor could have assets or legitimate business operations aside from the Ponzi scheme, as Alliance Bank argues here, that it uses to stave off insolvency, at least for a while. Such an entity could be financially stable for a time, whether its stability is measured by the technical definition of insolvency in Minn. Stat. §§ 513.42 and 513.45(a), or the alternate methods of measuring financial distress in Minn. Stat. § 513.44(a)(2). Such a Ponzi scheme may be rare, but when the statute requires a creditor to prove a fraudulent-transfer claim, a conclusive presumption that a Ponzi scheme is insolvent from its inception may be incorrect, both as a matter of law and as a matter of fact.

18

The Receiver relies on *Cunningham v. Brown*, 265 U.S. 1 (1924), to support its argument that a Ponzi scheme is always insolvent from its inception. In *Cunningham*, the Supreme Court of the United States described Charles Ponzi's scheme as "always insolvent and became daily more so, the more his business succeeded." *Id.* at 8. Some federal courts have seized upon that statement in *Cunningham* as support for adopting the second component of the Ponzi-scheme presumption. *See, e.g.*, *Wiand*, 753 F.3d at 1201 (relying on *Cunningham* for the proposition that Ponzi schemes are "insolvent and become more insolvent with each investor payment"); *Warfield*, 436 F.3d at 558 (referring to "a Ponzi scheme, which is, as a matter of law, insolvent from its inception" (citing *Cunningham*, 265 U.S. at 7-8)). However, to the extent that the Supreme Court's statement has any relevance to our interpretation of MUFTA, it reflects only the Court's observation that the particular swindle operated by Charles Ponzi, whose postage-stamp scheme never operated legitimately, was insolvent when it began. It does not stand for the broader proposition that every Ponzi scheme, even those businesses that once operated legitimately or had legitimate operations apart from the Ponzi scheme, is necessarily insolvent from its inception, without regard to whether the debtor was paying its debts as they became due or whether its debts exceeded its assets. Accordingly, we reject the second component of the Ponzi-scheme presumption.

3.

The third component of the Ponzi-scheme presumption requires a court to conclude—once again as a matter of law—that a debtor operating a Ponzi scheme cannot receive reasonably equivalent value for the "interest" or "profits" it pays to investors. As

19

discussed above, for constructive-fraud claims under Minn. Stat. §§ 513.44(a)(2) and 513.45(a), a creditor must prove that the debtor transferred its assets "without receiving a reasonably equivalent value in exchange for the transfer." And for actual-fraud claims under Minn. Stat. § 513.44(a)(1), a transferee may establish as an affirmative defense that he or she "took in good faith and for a reasonably equivalent value." Minn. Stat. § 513.48(a). Adopting the third component of the Ponzi-scheme presumption would effectively negate a transferee's good-faith defense to an actual-fraud claim and conclusively establish a crucial element of a constructive-fraud claim.

MUFTA does not define "reasonably equivalent value," but designates certain types of transactions as made for reasonably equivalent value in the context of a fraudulent-transfer claim. Such transactions include an asset acquired from the debtor "pursuant to a regularly conducted, noncollusive foreclosure sale" and the "execution of a power of sale for the acquisition or disposition of the interest of the debtor upon default under a mortgage, deed of trust, or security agreement." Minn. Stat. § 513.43(b). For other types of transactions, the determination of whether a debtor received reasonably equivalent value in exchange for a transfer of its assets depends on the facts and circumstances of each case. *See, e.g.*, *New Horizon Enters., Inc. v. Contemporary Closet Design, Inc.*, 570 N.W.2d 12, 16 (Minn. App. 1997) (stating that the determination of whether a debtor received reasonably equivalent value was an issue for the trial court to resolve based on all the facts and circumstances in the case); *see also Neubauer v. Cloutier*, 265 Minn. 539, 545, 122 N.W.2d 623, 629 (1963) (stating that the determination of "fair consideration" in exchange for a transfer under the predecessor to

20

MUFTA depended on, among other things, "the market value of the interest conveyed at the time of the transfer" and "the amount of antecedent debt thereby satisfied").

Determining whether a debtor has received reasonably equivalent value depends on how to "value" an exchange under MUFTA. MUFTA defines "value," in relevant part, as follows: "[v]alue is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied." Minn. Stat. § 513.43(a). As MUFTA's text and our cases confirm, deciding whether a debtor has received reasonably equivalent value is a function of the relative value received by the debtor in the underlying exchange. *See* Minn. Stat. §§ 513.44(a)(2), 513.45(a) (focusing on whether the debtor "made the transfer . . . without receiving reasonably equivalent value in exchange"); *In re Butler*, 552 N.W.2d 226, 232-34 (Minn. 1996) (explaining the concept of reasonably equivalent value).

MUFTA's text and our cases also confirm that the satisfaction of an antecedent debt can constitute reasonably equivalent value. *See* Minn. Stat. § 513.43(a) (stating that "value" is given if "an antecedent debt is secured or satisfied"); *see also Nat'l Sur. Co. v. Wittich*, 184 Minn. 21, 24, 237 N.W. 585, 586 (1931) (holding that satisfaction of an antecedent debt was "good consideration," and that the payment was not fraudulent with respect to creditors). In this case, as in most cases involving a Ponzi scheme, the value given to First United in exchange for the payment of Ponzi-scheme proceeds was the satisfaction of an antecedent debt. What qualifies as antecedent debt is not clear under MUFTA's text, but the statute defines the term "debt" broadly as "liability on a claim," Minn. Stat. § 513.41(5), which in turn refers to "a right to payment, whether or not the

21

right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." *Id.* § 513.41(3).

Our cases interpreting MUFTA's predecessor have recognized that antecedent debt can take a variety of forms. In *Kummet v. Thielen*, for example, the antecedent debt consisted of a personal loan between two spouses and one spouse's entitlement to insurance proceeds covering the damage to her household furnishings and personal effects. 210 Minn. 302, 303, 298 N.W. 245, 246 (1941). Similarly, in *Skinner v. Overend*, the antecedent debt involved unpaid wages to which a son was contractually entitled from his father. 190 Minn. 456, 457-58, 252 N.W. 418, 418-19 (1934). In both cases, we concluded that the satisfaction of the antecedent debt constituted "fair consideration" for the transfer of property, and that the debtor's creditors were not entitled to void the transfer as a fraudulent conveyance. *See Kummet*, 210 Minn. at 305-06, 298 N.W. at 247; *Skinner*, 190 Minn. at 458, 252 N.W. at 419. In light of these cases and the broad definitions of the terms "debt" and "claim" in MUFTA, we conclude that any legally enforceable right to payment against the debtor is sufficient to qualify as an antecedent debt under MUFTA. *See Kummet*, 201 Minn. at 305-06, 298 N.W. at 247 (noting that the obligation in question "was enforceable").

Generally speaking, investors in a Ponzi scheme provide funds to a scheme's operator based on the operator's promises to repay the investor's principal investment, plus more, at some point in the future. *See In re Vaughan Co. Realtors*, 481 B.R. 752, 760 (Bankr. D.N.M. 2012) (describing the "typical Ponzi scheme"). To maintain the

22

fraud, the scheme's operator typically cloaks the promised returns in the veneer of a legitimate investment opportunity. *See id.* In the current case, for example, First United promised investors that, if they purchased participation interests, they would receive disbursements once borrowers made payments on the loans underlying the investment. Absent the existence of a Ponzi scheme, such a promise would fit comfortably within the realm of antecedent debt, and satisfaction of that promise would constitute "value," as that term is defined in MUFTA.

However, courts that adopt the Ponzi-scheme presumption effectively deem a contract between the operator of a Ponzi scheme and an investor to be unenforceable as a matter of public policy. *See In re Hedged-Invs. Assocs., Inc.*, 84 F.3d 1286, 1290 (10th Cir. 1996) (holding that the contract, to the extent it provided excess returns to an investor, was unenforceable as a matter of public policy); *cf. In re Carrozzella & Richardson*, 286 B.R. 480, 487 (Bankr. D. Conn. 2002) (identifying "a line of cases . . . which focuses on the fact that the debtor was involved in a Ponzi scheme and, thus, to permit the investors to enforce their agreements with the debtor would be against public policy"). By doing so, the Ponzi-scheme presumption eliminates the possibility that an investor has a legally enforceable claim against the debtor based on the investment contract. Without a legally enforceable contractual claim, any payment made to an investor beyond its principal investment is not for antecedent debt, and therefore cannot be in exchange for reasonably equivalent value. *See, e.g.*, *Perkins v. Haines*, 661 F.3d 623, 627 (11th Cir. 2011) ("[T]he general rule is that a defrauded investor gives 'value' to the Debtor in exchange for a return of the principal amount of the investment, but not

as to any payments in excess of principal."); *Donell*, 533 F.3d at 777-78 ("Up to the amount that 'profit' payments return the innocent investor's initial outlay . . . . there is an exchange of 'reasonably equivalent value' for the defrauded investor's outlay. Amounts above this . . . are not a 'reasonably equivalent' exchange for the defrauded investor's initial outlay.").

Two principles guide the reasoning of the courts that have concluded that investment contracts with Ponzi-scheme operators are contrary to public policy. The circumstances of this case provide reason to doubt both principles.

The first principle is a factual observation about the nature of most Ponzi schemes: the payment of "profits" from a Ponzi scheme comes solely from funds stolen from other participants and serves only the purpose of concealing the scheme and allowing it to continue. In *Donell*, for example, the court observed that "[p]ayouts of 'profits' made by Ponzi scheme operators are not payments of return on investment from an actual business venture." 533 F.3d at 777; *see also In re Indep. Clearing House Co.*, 77 B.R. 843, 858 (Bankr. D. Utah 1987) ("[T]he debtors here had no legitimate source of earnings but were operating a Ponzi scheme."). In many Ponzi schemes, it is true that there is no legitimate source of earnings and the payment of profits "confer[s] no benefit on the [Ponzi scheme] but merely deplete[s] [the scheme's] resources faster." *Scholes v. Lehmann*, 56 F.3d 750, 757 (7th Cir. 1995). However, not every Ponzi scheme lacks a legitimate source of earnings. Here, for example, no one disputes that First United operated a Ponzi scheme (at least at some point), but there is also no dispute that the banks in this case purchased

24

non-oversold participation interests in *actual* loans to *real* borrowers, which provided First United with a legitimate source of earnings with which to pay the banks.

The second principle is a dubious assumption about the purpose of fraudulent-transfer laws. In *Donell*, the court stated:

> [t]he purpose of UFTA is to permit the receiver to collect those assets that can actually be located and recovered in the wake of a Ponzi scheme, and to ratably distribute those assets among all participants, including the many investors who lost everything. UFTA accomplishes this by requiring good faith participants to disgorge their gains and permitting them [to] keep the full amount of their initial investment.

533 F.3d at 779; *see also, e.g., In re Petters Co.*, 499 B.R. 342, 356 (Bankr. D. Minn. 2013) ("[G]reater equity is deemed to lie in favor of unsatisfied creditors and investors."). Likewise, the Receiver argues here that we should adopt the Ponzi-scheme presumption because it avoids the "absurd[ity] and inequit[y]" of allowing "a criminal mastermind like Johnston," the Ponzi-scheme operator, to determine "who profits from the Ponzi scheme and who bears the loss." One of the *amici* echoes the Receiver's argument by asserting that fraudulent-transfer actions are an "essential tool" for achieving equality among all of the victims of a Ponzi scheme.

Yet equality among a debtor's creditors, even if they are victims of a Ponzi scheme, is *not* the purpose of MUFTA. Rather, its purpose is to "prevent debtors from putting property which is available for the payment of their debts beyond the reach of their creditors." *In re Butler*, 552 N.W.2d 226, 232 (Minn. 1996) (quoting *Kummet v. Thielen*, 210 Minn. 302, 306, 298 N.W. 245, 247 (1941)). Under Minnesota's fraudulent-transfer laws, a transfer qualifies as constructively fraudulent only if it depletes the assets

of the debtor without a reasonably equivalent reduction in the debtor's liabilities. As we

have recognized,

> [p]ayment of an honest debt is not fraudulent under the general statutes against fraudulent conveyances, although it operates as a preference; the rule being that a preference by an insolvent debtor of one of his creditors can be avoided only by appropriate proceedings under the bankruptcy law . . . and is not open to attack in an action brought by another creditor.

*Thompson v. Schiek*, 171 Minn. 284, 287, 213 N.W. 911, 912 (1927); *see also, e.g.*,

*Wittich*, 184 Minn. at 24, 237 N.W. at 586 (rejecting a fraudulent-transfer claim because

"[t]he antecedent debt was a good consideration, and the fact that it was a preference in

no way invalidated the transaction").

Many of the Receiver's arguments focus on the purported unfairness of allowing

some creditors to profit at the expense of others. However, with one exception that is not

relevant here,[1] MUFTA does not prohibit a debtor from making a preferential transfer in

favor of one bona fide creditor over another, so long as the transfer is not fraudulent. *See*

*Aretz v. Kloos*, 89 Minn. 432, 439, 95 N.W. 216, 219 (1903) (stating that preferences in

favor of a "bona fide creditor" are valid "in the absence of actual fraud"); *Vose v.*

*Stickney*, 19 Minn. 367, 369 (Gil. 312, 314) (1872) (declaring that it is "clearly not

unlawful" to prefer one creditor over another, even if the preference has "the incidental

effect of preventing [another creditor] from collecting his debt"). Mere preferences are

different from fraudulent transfers because "[t]he basic object of fraudulent conveyance

---

[1]    The lone exception is that MUFTA treats certain preferential transfers made to *insiders* as fraudulent. Minn. Stat. § 513.45(b).

law is to see that the debtor uses his limited assets to satisfy *some* of his creditors; it normally does not try to choose among them." *Boston Trading Grp., Inc. v. Burnazos*, 835 F.2d 1504, 1509 (1st Cir. 1987) (Breyer, J.).

In short, neither of the principles underlying the third component of the Ponzi-scheme presumption is persuasive, especially as applied to the facts alleged in this case. Accordingly, like the first two components, we decline to adopt the third component of the Ponzi-scheme presumption.

B.

Even though we have rejected each component of the Ponzi-scheme presumption, we still must address the specific actions taken by the district court with respect to the various dispositive motions filed by the parties in this case. Specifically, we must first decide whether the district court properly granted the Respondent Banks' motion to dismiss, and then determine whether it properly granted summary judgment to the Receiver against Alliance Bank.

1.

The district court granted the motion to dismiss filed by the Respondent Banks because, according to the court, the Receiver's lawsuit was untimely under the applicable statute of limitations, an issue that we address in Part III of this opinion. The Respondent Banks also sought dismissal, however, on the ground that the Receiver's complaint failed to state a legally sufficient claim.

In reviewing whether a complaint has stated a claim under Minn. R. Civ. P. 12.02(e), we consider "only the facts alleged in the complaint, accepting those facts as

true and must construe all reasonable inferences in favor of the nonmoving party." *Gretsch v. Vantium Capital, Inc.*, 846 N.W.2d 424, 429 (Minn. 2014) (quoting *Park Nicollet Clinic v. Hamann*, 808 N.W.2d 828, 831 (Minn. 2011)). A district court may only dismiss a complaint under Rule 12.02(e) if "it appears to a certainty that no facts, which could be introduced consistent with the pleading, exist which would support granting the relief demanded." *Walsh v. U.S. Bank, N.A.*, 851 N.W.2d 598, 602 (Minn. 2014) (quoting *N. States Power Co. v. Franklin*, 265 Minn. 391, 395, 122 N.W.2d 26, 29 (1963)). However, as we recently reiterated, "we are 'not bound by legal conclusions stated in a complaint when determining whether the complaint survives a motion to dismiss for failure to state a claim.' " *Walsh*, 851 N.W.2d at 603 (quoting *Hebert v. City of Fifty Lakes*, 744 N.W.2d 226, 235 (Minn. 2008)).

The Respondent Banks argue that the Receiver failed to allege adequate facts in support of three elements of its fraudulent-transfer claims: actual fraudulent intent by First United, First United's insolvency, and a lack of reasonably equivalent value in the exchanges. Although the Receiver's complaint sufficiently alleged facts in support of the first two elements, we agree with the Respondent Banks that the Receiver insufficiently pleaded the lack-of-reasonably-equivalent-value element of a constructive-fraud claim.

As to the first element, the Receiver's complaint sufficiently alleged fraudulent intent. The complaint documented a number of fictitious and oversold participation interests sold by First United, and alleged that First United made the payments to the Respondent Banks with "actual intent to hinder, delay, or defraud creditors of [First United] or Johnston." It also stated that Johnson admitted, as "part of his guilty plea and

28

plea agreement[,] that he operated a Ponzi scheme *to defraud banks* in connection with commercial loans that Johnston had arranged" (emphasis added). Construing all reasonable inferences in the Receiver's favor, we agree with the court of appeals that the Receiver's complaint stated a claim for actual fraud against the Respondent Banks. *Finn*, 838 N.W.2d at 603-04.

The Receiver's complaint also sufficiently alleged that First United was insolvent when it made payments to the Respondent Banks. The complaint stated that, "[a]t the time of the transfers[,] . . . [First United] and Johnston were engaged in or were about to engage in business for which their remaining assets were unreasonably small in relation to their business." Indeed, the complaint recounted not only the details of the Ponzi scheme, but also asserted that Johnston diverted nearly $23 million "to support his lavish lifestyle" and that First United "maintained no system to track the over $1.6 billion in cash transfers." Given these factual allegations, and the inferences that can be drawn from them, we conclude that the Receiver's complaint sufficiently alleged facts in support of the insolvency-related requirements of Minn. Stat. § 513.44(a)(2) and Minn. Stat. § 513.45(a).

However, in light of our holding that there is no Ponzi-scheme presumption, the Receiver's complaint does not sufficiently allege the third element: that the transfers to the Respondent Banks lacked reasonably equivalent value. The most relevant allegation in the Receiver's complaint is that, "because [First United] and Johnston were engaged in a Ponzi scheme, [First United] did not receive reasonably equivalent value in exchange for the profits it paid." This allegation, on its face, is nothing more than a legal

presumption that, as we conclude above, does not accurately reflect Minnesota law. There are no other allegations from which a factfinder could draw a reasonable inference that the payments made by First United to the Respondent Banks were for anything other than the satisfaction of First United's antecedent debts. Accordingly, because the Receiver's complaint relies exclusively on an incorrect statement of the law to support the lack-of-reasonably-equivalent-value element, we affirm the district court's decision to dismiss the Receiver's constructive-fraud claims against the Respondent Banks.[2]

2.

Unlike the claims against the Respondent Banks, the proceedings against Alliance Bank advanced to the summary-judgment stage, at which point both the Receiver and Alliance Bank filed motions for summary judgment. The district court granted the Receiver's motion for summary judgment and denied the motion filed by Alliance Bank. The court reasoned that, under the Ponzi-scheme presumption, any payments received by Alliance Bank in excess of its principal investment were voidable as fraudulent transfers under MUFTA.

On appeal, we must determine if the district court correctly concluded that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show[ed] that there [was] no genuine issue as to any material fact and that [the Receiver was] entitled to judgment as a matter of law." Minn. R. Civ. P. 56.03.

---

[2] We leave it to the district court's discretion to determine whether to grant the Receiver leave to amend its complaint against the Respondent Banks on remand. *See* Minn. R. Civ. P. 15.01.

Reviewing the district court's grant of summary judgment de novo, we "view the evidence in the light most favorable to the party against whom summary judgment was granted." *Sampair v. Vill. of Birchwood*, 784 N.W.2d 65, 68 (Minn. 2010).

Once the Ponzi-scheme presumption is set aside, the undisputed factual record requires summary judgment in favor of Alliance Bank rather than against it. To establish constructive fraud, the Receiver must prove both that First United did not receive reasonably equivalent value for its payments and that First United met the insolvency-related requirements in Minn. Stat. § 513.44(a)(2) or Minn. Stat § 513.45(a). Similarly, Alliance Bank can establish an affirmative defense to the Receiver's actual-fraud claim by proving that it gave reasonably equivalent value to First United and that it took the payments in good faith.[3] With respect to both types of claims, the absence of a genuine issue of material fact regarding whether First United received reasonably equivalent value based on the satisfaction of its antecedent debt would require us to grant judgment as a matter of law to Alliance Bank.

The value claimed by Alliance Bank is the satisfaction of the debt owed by First United under the participation agreement between the parties. Under that agreement, Alliance Bank purchased a 100% undivided interest in the loan to Jerry Moyes and all of its proceeds. The Receiver does not dispute that the Moyes loan was real and not oversold. The participation agreement obligated First United to act as Alliance Bank's

---

[3]    The Receiver does not dispute that Alliance Bank received the payment in good faith and without knowledge of the underlying fraud. Moreover, it is undisputed that Alliance Bank performed due diligence on the Moyes loan and ensured that the loan was properly secured.

agent in receiving payments on the loan, and then contractually required First United to remit those payments to Alliance Bank. Because we have already rejected a rule requiring us to invalidate all contracts made with a Ponzi-scheme operator, and the Receiver essentially provides no reason to invalidate the participation agreement other than the fact it was a part of a greater Ponzi scheme,[4] we conclude that the satisfaction of First United's antecedent debt constituted "value" under MUFTA. Minn. Stat. §§ 513.41(3), 513.41(5).

The record also does not present a genuine issue of material fact regarding whether the value received by First United was reasonably equivalent to the payments it made to Alliance Bank. As stated above, First United was contractually obligated to pass on the interest and principal payments it received from Moyes to Alliance Bank. Alliance Bank introduced evidence at the summary-judgment stage, again undisputed, that the rate of return on the loan it purchased was commercially reasonable. Under these circumstances, we agree with the court of appeals that, "because the underlying uncontested facts show that First United received reasonably equivalent value for its transfers to Alliance, the district court erred by denying Alliance's motion for summary

---

[4] Although the Receiver claims that its proposed rule would only invalidate "investment" contracts, there is no obvious limiting principle to the scope of the rule it proposes. For example, suppose that a Ponzi-scheme operator uses $1,000 in Ponzi-scheme proceeds to buy a futures contract from a securities dealer. It is a speculative move by the Ponzi-scheme operator, who believes that the price of the commodity underlying the futures contract will increase. Under the Receiver's proposed rule, because the transaction involves an investment, the payment to the securities dealer potentially would be recoverable under MUFTA as a fraudulent transfer if the price of the commodity falls, even if the Ponzi-scheme operator purchased the futures contract at the prevailing market price.

judgment." *Finn*, 838 N.W.2d at 603. Accordingly, we instruct the district court on remand to grant summary judgment to Alliance Bank and to deny the Receiver's motion for summary judgment.

III.

The next question presented in this case requires us to identify the statute of limitations applicable to MUFTA claims. Two possibilities exist. The first requires a party to file an action "upon a liability created by statute" within 6 years. Minn. Stat. § 541.05, subd. 1(2). The other requires a party to file an action "for relief on the ground of fraud" within 6 years, but provides that "the cause of action shall not be deemed to have accrued until the discovery by the aggrieved party of the facts constituting the fraud." Minn. Stat. § 541.05, subd. 1(6). Because MUFTA claims are, on the one hand, statutory claims, and on the other, claims based on fraud, either provision potentially applies.[5]

---

[5] The dispute about the applicable statute of limitations relates solely to the Receiver's claims against the Respondent Banks. As to those claims, the district court granted the Receiver's motion to dismiss based both on its conclusion that fraudulent-transfer claims are "liabilit[ies] created by statute" and its finding that the Receiver had failed to timely commence its action against the Respondent Banks within 6 years after its claims had accrued. Although we concluded in Part II that the Receiver failed to adequately plead the lack-of-reasonably-equivalent-value element of its constructive-fraud claims, our conclusion has no bearing on the Receiver's actual-fraud claims. For those claims, the Receiver had to plead only those facts establishing that First United had an "actual intent to hinder, delay or defraud" First United's creditors. *See* Minn. Stat. § 513.44(a)(1). It did not also have to plead a lack of reasonably equivalent value because only transferees—in this case, the Respondent Banks—carry the burden to plead and prove the affirmative defense in Minn. Stat. § 513.48. *See* Minn. Stat. § 513.48(a) ("A transfer or obligation is not voidable under section 513.44(a)(1) against a person who

(Footnote continued on next page.)

In addressing the statute-of-limitations question, the court of appeals divided MUFTA claims into two categories. For actual-fraud claims under Minn. Stat. § 513.44(a)(1), it relied on our decision in *McDaniel*, to hold that, because actual-fraud claims existed at common law, they are for "relief on the ground of fraud" and accrue only upon the discovery of the facts constituting the fraud. *Finn*, 838 N.W.2d at 594-95; *see generally McDaniel v. United Hardware Distrib. Co.*, 469 N.W.2d 84 (Minn. 1991). In contrast, the court deemed constructive-fraud claims under Minn. Stat. § 513.44(a)(2) or Minn. Stat § 513.45(a) as "liabilit[ies] created by statute" because no comparable cause of action existed at common law and such claims are actionable only under MUFTA. *Finn*, 838 N.W.2d at 593-94. We express no opinion on the statute of limitations applicable to constructive-fraud claims because of our conclusion in Part II that the Receiver did not adequately plead such claims in its complaint. However, we agree with the court of appeals that actual-fraud claims are subject to the limitations period applicable to actions "for relief on the ground of fraud."

The selection of an appropriate statute of limitations presents a question of law that we review de novo. *Park Nicollet Clinic v. Hamann*, 808 N.W.2d 828, 831 (Minn. 2011). In selecting the statute of limitations that applies to actual-fraud claims, we are not writing on a clean slate. In particular, we have historically described claims to set aside fraudulent conveyances as "claims for relief on the ground of fraud" and applied a

(Footnote continued from previous page.)
took in good faith and *for a reasonably equivalent value* or against any subsequent transferee or obligee." (emphasis added)).

34

discovery rule to such claims.  *See, e.g.*, *Brasie v. Minneapolis Brewing Co.*, 87 Minn. 456, 463, 92 N.W. 340, 342 (1902) ("G. S. 1894, § 5136, provides that an action for relief on the ground of fraud shall be brought within six years from the discovery of the fraud; and it has been held by this court that an action to set aside a conveyance alleged to have been executed for the purpose of defrauding creditors comes within the meaning of that statute."); *Duxbury v. Boice*, 70 Minn. 113, 117-19, 72 N.W. 838, 838-39 (1897) (stating that an action "to set aside as fraudulent and void as to creditors of the grantor a conveyance" "was one 'for relief on the ground of fraud,' and therefore the limitation applicable is . . . six years after 'the discovery by the aggrieved party of the facts constituting the fraud.' "). We have never suggested that "relief on the ground of fraud" is so narrow that it includes only those claims that qualify as common-law fraud. To the contrary, "actions for relief on the ground of fraud" may include "not only such actual frauds as may form the basis for actions at law, but also all such transactions as a court of equity will adjudge to be frauds, actual or constructive." *St. Paul, Stillwater & Taylor's Falls Ry. Co. v. Sage*, 49 F. 315, 321 (8th Cir. 1892) (applying Minnesota law).

The Respondent Banks argue, however, that the law on fraudulent transfers has evolved in the more than 100 years since we decided *Brasie* and *Duxbury*, and that the evolution has largely come by statute. *See* Uniform Fraudulent Conveyance Act, Act of Apr. 20, 1921, Ch. 415, 1921 Minn. Laws 642; MUFTA, Act of Apr. 7, 1987, ch. 19, 1987 Minn. Laws 28 (codified at Minn. Stat. §§ 513.41-.51). In their view, the enactment of these statutes converted fraudulent-transfer claims from claims "for relief on the ground of fraud" to claims "upon a liability created by statute."

35

As the court of appeals recognized, the argument made by the Respondent Banks is inconsistent with our decision in *McDaniel*, in which we considered whether retaliatory-discharge claims are "liabilit[ies] created by statute" or are for the nonpayment of wages. 469 N.W.2d at 85. We ultimately concluded that the retaliatory-discharge claim in *McDaniel* was a liability created by statute, but only after observing that the statutory remedy at issue preceded common-law recognition of the tort by "more than a decade." *Id.* at 85, 88. Here, by contrast, the parties do not dispute that fraudulent-transfer claims based on an actual intent to hinder, delay, or defraud creditors existed at common law as early as 1868, and likely earlier. *See Blackman v. Wheaton*, 13 Minn. 326, 330 (Gil. 299, 303) (1868). Setting aside whether constructive-fraud claims existed at common law—a question we need not answer—the fact that the Legislature has codified fraudulent-transfer liability does not change the underlying "gist and essence" of fraudulent-transfer law. *McMillan v. Cheeny*, 30 Minn. 519, 521, 16 N.W. 404, 405 (1883). Nor does it transform it into a liability created by statute, which, as we made clear in *McDaniel*, does not apply "to liabilities existing at common law which have been recognized by statute." 469 N.W.2d at 85.

In short, for the limited purpose of determining the applicable statute of limitations, we conclude that a claim against a transferee that receives an actually fraudulent transfer under MUFTA is for "relief on the ground of fraud," just as it was for a transferee that received a fraudulent transfer at the time of *McMillan* and *Duxbury*. Thus, we agree with the court of appeals that the district court erred when it dismissed the Receiver's actual-fraud claims under Minn. Stat § 541.05, subd. 1(2), and therefore

36

remand to the district court for consideration of whether the Receiver filed its action within 6 years of the discovery of the "facts constituting the fraud."

IV.

With respect to the Receiver's claims against Alliance Bank, we affirm as modified and instruct the district court to grant summary judgment to Alliance Bank on remand. As to the Receiver's claims against the Respondent Banks, we conclude that the Receiver failed to adequately plead constructive fraud. However, we remand to the district court for consideration of whether the dismissal of the Receiver's constructive-fraud claims should be with or without prejudice, and for a determination of whether the Receiver commenced its action based on actual fraud within 6 years after the discovery of the facts constituting the fraud. Accordingly, for the foregoing reasons, we affirm as modified and remand to the district court for further proceedings consistent with this opinion.

Affirmed.

37