IN RE: POLAROID CORPORATION,
et al, Debtors.

(includes: Polaroid Holding Company; Polaroid Consumer Electronics, LLC; Polaroid Capital, LLC; Polaroid Latin America I Corporation; Polaroid Asia Pacific LLC; Polaroid International Holding LLC; Polaroid New Bedford Real Estate, LLC; Polaroid Norwood Real Estate, LLC; Polaroid Waltham Real Estate, LLC)

John R. Stoebner, Trustee, Plaintiff,

v.

Opportunity Finance, LLC; Opportunity Finance Securitization, LLC; Opportunity Finance Securitization II, LLC; Sabes Minnesota Limited Partnership; Robert W. Sabes; Janet F. Sabes; Jon R. Sabes; Steven Sabes; DZ Bank AG Deutsche Zentral-Genossenschafts-bank, Frankfurt Am Main; and John and Jane Does 1-30, Defendants.

JOINTLY ADMINISTERED UNDER
CASE NO. 08-46617
Court File No. 08-46617
Court File Nos: 08-46621 (GFK), 08-46620 (GFK), 08-46623 (GFK), 08-46624 (GFK), 08-46625 (GFK), 08-46626 (GFK), 08-46627 (GFK), 08-46628 (GFK), 08-46629 (GFK)
ADV 10-4600

United States Bankruptcy Court,
D. Minnesota.

Signed January 14, 2016

Amy L. Schwartz, Richard T. Thomson, Rosanne H. Wirth, Lapp, Libra, Thomson, Stoebner & Pusch, Minneapolis, MN, for Plaintiff.

Jefferey D. Bailey, Jonathan M. Landy, Christopher J. Mandernach, Joseph G. Petrosinelli, Williams and Connolly LLP, Washington, DC, Benjamin Gurstelle, John R. McDonald, Briggs and Morgan, P.A., Minneapolis, MN, Michael Rosow, Winthrop & Weinstine, Minneapolis, MN, for Defendant.

## ORDER GRANTING DEFENDANTS' MOTIONS FOR DISMISSAL

GREGORY F. KISHEL, CHIEF UNITED STATES BANKRUPTCY JUDGE

This adversary proceeding came before the court for hearing on two separate motions for dismissal. One movant was Defendant DZ Bank AG Deutsche Zentral-Genossenschaftsbank, Frankfurt am Main ("DZ Bank"). It appeared by its attorney, H. Peter Haveles, Jr., Kaye Scholer LLP. The remaining named Defendants (collectively, "the Opportunity Finance defendants") made the other motion. They appeared by their attorney, Joseph G. Petrosinelli, Williams & Connolly LLP. The Plaintiff ("the Trustee") appeared by his attorneys, Richard T. Thomson, Stephen J. Creasey, and Amy L. Schwartz, Lapp, Libra, Thomson, Stoebner & Pusch. This decision is based on the written submissions for both motions, the Trustee's Second Amended Complaint, and the arguments of counsel.

## INTRODUCTION

This adversary proceeding is another outgrowth of the largest bankruptcy cases ever commenced in the District of Minnesota—those of Petters Company, Inc. ("PCI") and certain of its affiliates, BKY 08–45257, and the related group of cases in which the Polaroid Corporation was the lead debtor, BKY 08–46617. The precipitant of the bankruptcy filings was the failure of massive criminal activity perpetrated by Thomas J. Petters through PCI. Measured by aggregate losses, it was the largest case of financial fraud in Minnesota history. It appears to have been the third largest Ponzi scheme in United States history.

Before late September, 2008, Tom Petters was a prominent presence in entrepreneurial circles in Minnesota. After starting in the 1980s as a direct retailer of overstock and surplus merchandise, he built a sizeable corporate edifice under the umbrella of PCI and another holding company, Petters Group Worldwide, LLC ("PGW"). Through PCI, Tom Petters held himself out as an intermediary for the sale and acquisition of merchandise inventory directly between retailers, outside customary producer-retailer channels. In retail-trade circles, this sort of activity is called "diverting." After Tom Petters was arrested in early October, 2008, it emerged that the great majority of PCI's activity was "diverting" of a different sort—a sham, an elaborate Ponzi scheme. Over a period of years, more than 200 parties were involved in lending to PCI that was ostensibly to finance inventory transactions. Post-collapse investigation revealed that such funding was actually used to repay earlier lenders to PCI.

Federal criminal charges were brought against Tom Petters. In connection with them, a receiver was appointed to secure and marshal his assets. Soon after that, the receiver put PCI and a group of its affiliated entities into bankruptcy under Chapter 11. The Trustee in the PCI-related cases is engaged in a massive "clawback" litigation effort to remediate the brunt of the scheme's failure on the lender-investors left unsatisfied at the end.[1]

Apart from his activity through PCI, Tom Petters had acquired interests in independent, established business operations of very different profiles: Sun Country Airlines (acquired in full October, 2006); the mail-order retailer Fingerhut Direct Marketing, n/k/a Bluestem Brands (significant equity acquired 2004/2007); and, here, the Polaroid Corporation (acquired in full April, 2005).[2] PCI's faltering and failure had a rapid cascade-effect for the Polaroid Corporation and its affiliates.[3] Bankruptcy filings for the Polaroid Corporation and a group of its affiliates followed, within two months.[4]

1. *See, e.g., In re Petters Company, Inc.,* 494 B.R. 413, 418–419; 495 B.R. 887; and 499 B.R. 342 (all Bankr.D.Minn.2013).

2. PGW or other entities in Tom Petters's complicated enterprise structure were the vehicles for these acquisitions.

3. It has been alleged that Tom Petters diverted cash from the PCI enterprise structure into the operations of the Polaroid enterprise after his acquisition. This would have happened during the time that the Polaroid enterprise was trying to develop new, digitally-based product lines to replace its phased-out legacy business of instant-film photography. It has been alleged that the cash infusions partially supported the operations during that time. (These points of fact are relevant to other litigation in these cases and the PCI cases; thus these summaries of party-allegations are not findings on the facts themselves.)

4. The Polaroid debtors filed under Chapter 11 in their own right in late December, 2008. The most significant assets of the Polaroid debtors were sold in May, 2009 through a process structured under 11 U.S.C. § 363.

As pleaded, however, this adversary proceeding comes out of the prehistory of all that. It is based on acts and events that happened before Tom Petters acquired the Polaroid Corporation's actual structure.

The Trustee's suit is premised on a discrete chain of business and lending transactions. He describes them in the complaint as follows.[5] Before April, 2005, Tom Petters transacted with the Polaroid enterprise as it was operated under previous ownership. He used a company in his *personal* enterprise structure for these dealings. The Polaroid Corporation of that time was his contractual counterparty. Through these transactions Tom Petters procured and distributed new consumer goods, under license of the Polaroid brand and marks. To put it directly: the transactions at issue in this adversary proceeding involved the generalized banner of the Polaroid name; *but,* at the time of the transactions at issue Tom Petters was contracting with the Polaroid enterprise *from the outside.*[6] The Opportunity Finance defendants were involved in those transactions, as lenders that provided the funding to Tom Petters for the acquisition, branding, and disposition of the goods. DZ Bank, as a senior secured lender to the Opportunity Finance defendants, provided those parties the funding for their lending to the Petters enterprise.

In his initial pleading, the Trustee postured this adversary proceeding similarly to the "clawback" litigation pending in the PCI cases.[7] The Trustee cites 11 U.S.C. § 544(b) as his statutory empowerment to sue for avoidance.[8] He relies on the fraudulent-transfer law of Minnesota for the substantive governance.[9] For these cases, the applicable statute is the Minnesota enactment of the Uniform Fraudulent Transfer Act, Minn.Stat. §§ 513.41—513.51 (2014) ("MUFTA").[10] His complaint bla-

---

**5.** This is a summary of fact-pleading, with some judicial observations about the gist of the facts pled. There are no findings of fact here.

**6.** In light of his later acquisition, it is possible that Tom Petters was using this experience to test-drive the Polaroid brand and its market strength at that time.

**7.** The Opportunity Finance defendants have been sued in two adversary proceedings on the litigation docket in the PCI cases, ADV 10–4301 and ADV 10–4375. Those matters concern transactions between the Opportunity Finance defendants and PCI, transactions that were entirely distinct from the ones at issue here. However, blurring a line, the Trustee here asserts that some of his theories of liability under 11 U.S.C. § 550(a) are founded on his "belief .... based in part on documentation surrounding the [t]ransfers" that are at issue in the PCI adversary proceedings. Second Amended Complaint [Dkt. No. 46], ¶ 80. Whatever that means.

**8.** Subject to an exception not applicable here, this statute provides:

.....the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under [11 U.S.C. § ] 502 ... or that is not allowable only under [11 U.S.C. § ] 502(e)....

11 U.S.C. § 544(b)(1).

**9.** In application, § 544(b)(1) enables the trustee to invoke the state substantive law of fraudulent transfer, if an unsecured creditor could have used it outside of bankruptcy to challenge its debtor's transfers of assets. *E.g., In re Marlar,* 267 F.3d 749, 755–756 (8th Cir.2001); *In re Popkin & Stern,* 223 F.3d 764, 768 n. 11 (8th Cir.2000); *In re Estate of Graven,* 64 F.3d 453, 456 n. 5 (8th Cir.1995); *In re Graven,* 936 F.2d 378, 383 n.7 (8th Cir.1991); *In re DLC, Ltd.,* 295 B.R. 593, 601 (8th Cir. BAP 2003).

**10.** In 2015 MUFTA was amended and retitled using a new uniform law, the Uniform Voidable Transactions Act.2015 Minn. Laws, ch. 17. The enactment made changes to vocabulary and some substance, but the large bulk of MUFTA's provisions is still law. The amend-

zons many of the same factual theories, legal concepts, and arguments to justify this suit; it features much the same wording in its text. The effort is obvious: to evoke a strong resonance with the essence of "clawback"—a complex of legal remedies advanced to relieve end-victims from the patent inequity left after the failure of a Ponzi scheme.[11]

However—as will be seen—there are marked differences between the theory and basis of suit for the PCI docket, and the pleaded factual basis and legal substance of this adversary proceeding. This is a product of the historical boundary line that lies at Tom Petters's acquisition of the Polaroid enterprise in 2005, when he ceased to be a contractual counterparty with the enterprises's previous owner and himself took the ownership of the Polaroid enterprise that ended up in bankruptcy.

At this point, the most crucial difference lies at the bottom of the legal framework for avoidance litigation in bankruptcy: the named plaintiff's standing as trustee to bring suit on the subject transfers, and whether his chosen remedy even applies to those transfers. For a motion for dismissal, that issue presents the biggest defect in the Trustee's fact-pleading—transplanted as it was from litigation that featured simi-

lar legal claims but different fact-pleading. Were that defect somehow remedied, there is another large gap in the facts he pleads for the relief he seeks. That one stems from a development in precedential case law that occurred after this matter was sued out.

## THE PARTIES; THEIR POSTURE IN RELATION TO THE CLAIMS IN SUIT

The Trustee is the statutory steward of the bankruptcy estates of the Polaroid debtors, the corporate entities that are in bankruptcy in these cases.[12] *See* 11 U.S.C. §§ 701, 702(d), and 704. He was appointed as such after the Polaroid debtors' cases were converted for liquidation under Chapter 7 in late August, 2009.[13] For his avoidance claims in this adversary proceeding, however, he tries to assume a status derivative of a different company named Petters Consumer Brands, LLC ("PettersCB"), or a company descended from PettersCB.

PettersCB was the entity in Tom Petters's personal enterprise structure that did business in consumer electronic goods bearing the Polaroid brand name, *before* Tom Petters acquired the whole Polaroid enterprise in April, 2005.[14] Second

---

ment applies only to transactions occurring after August 1, 2015. 2015 Minn. Laws, c. 17, § 13. Thus, MUFTA's provisions in their entirety still apply to this adversary proceeding.

**11.** *See In re Petters Co., Inc.*, 499 B.R. at 355-359 (discussing analysis in *Scholes v. Lehmann*, 56 F.3d 750 (7th Cir.1995)).

**12.** "The Polaroid debtors" will be a collective reference to the specific entities named in the caption for the underlying cases—i.e., the entities that are in bankruptcy, in these cases and before this court.

**13.** The sale process under § 363 was conducted and a sale was consummated while the

Polaroid debtors were still debtors in possession. After that, the cases were converted on motion of the United States Trustee; there was no longer a going concern and liquidation under Chapter 7 was adjudged to be in the better interests of creditors than postconfirmation liquidation under Chapter 11.

**14.** The use of an expanded form of abbreviation for this entity is deliberate, to draw that temporally-driven distinction. So far the parties to this lawsuit have used "PCB" to signify PettersCB. However, "PCE"—*Polaroid* Consumer *Electronics*, LLC—is present as a debtor and a historical participant in *later* events, and its past dealings are in active controversy in pending litigation in these cases. As came out at oral argument, the "PCB" cognomen

Amended Complaint, ¶ 36 ("During the time in question, [PettersCB] was in the business of buying consumer electronics to which [it] would affix the 'Polaroid' brand name and sell to retailers like Best Buy."). Through this adversary proceeding, the Trustee invokes MUFTA to avoid payments of money made to one or more of the Opportunity Finance defendants from 2003 through 2005, on financing they provided for transactions to which PettersCB was a contractual party. Second Amended Complaint, ¶ 40. He also sues Defendant Opportunity Finance, LLC (individually, "OppFinLLC") in separate counts under common-law theories (breach of contract and fraud). Somewhat confusingly, he classifies the relief he requests under those counts by using the same wording as under the statutory counts—the avoidance of transfers.

The Trustee identifies two multi-membered groupings within the defendants he sues. The first consists of four natural persons—all members of the Sabes family—plus Sabes Minnesota Limited Partnership, a family partnership formed by them. (His collective nomenclature for these defendants, "the Sabes Family Defendants," will be used for consistency.) The second consists of three artificial entities—OppFinLLC, Opportunity Finance Securitization, LLC, and Opportunity Finance Securitization II, LLC (collectively, "Opportunity Finance Entity–Defen-

dants"). Three of the Sabes Family Defendants are alleged to have been connected variously to the Opportunity Finance Entity–Defendants, as "a founder" (Robert W. Sabes); the operator "on a day-to-day basis" (Jon R. Sabes); and "a principal" (Steven Sabes). Second Amended Complaint, ¶¶ 9, 11, 12.

The Trustee names OppFinLLC as the specific defendant-entity that extended money or credit, via loans, to enable PettersCB to acquire consumer electronic goods for resale. Second Amended Complaint, ¶¶ 40–41, 43–45. It is alleged that OppFinLLC required PettersCB to create a separate entity, Petters Consumer Brands Funding, LLC ("PettersCB Funding"). PettersCB Funding was to serve as a "bankruptcy remote vehicle" for these financing transactions. Second Amended Complaint, ¶ 46.[15] The Trustee asserts that both sides of participant in this "bankruptcy remote" arrangement failed to comply with the structural separation and operating requirements of their agreements. In the Trustee' estimation, "[a]t most, [PettersCB] Funding was a mere conduit through which money was transferred." Second Amended Complaint, ¶¶ 49–51. Thus, as the Trustee would have it, the arrangement may not be given "bankruptcy remote" effect now, as a potential shelter from avoidance.

OppFinLLC "or other Defendants" are identified as the recipients of payment on

has already created too much confusion. "PCE" has long been the tag for the Polaroid-affiliated Debtor-entity throughout the underlying cases—so that abbreviation is the one to be preserved.

15. As the Trustee pled the terms of the arrangement, PettersCB Funding was to be an intermediate participant in the financing. OppFinLLC as lender was to advance directly to PettersCB Funding; PettersCB Funding would readvance to PettersCB to fund PettersCB's actual transaction in Polaroid-

branded goods; PettersCB Funding would receive PettersCB's pledge or assignment of the resulting account receivable as security; PettersCB Funding would then receive the payment from PettersCB's customer on PettersCB's direction; and PettersCB Funding would allow OppFinLLC to make an authorized sweep of PettersCB Funding's bank account to satisfy OppFinLLC on its lending. Second Amended Complaint, ¶ 46. The excess of the account balance over the debt payment was to be PettersCB Funding's property. Id.

the debt associated with these financing arrangements, liable as such for the purposes of avoidance. The total of such payments is stated as more than $251,000,000.00, including more than $3,298,000.00 in "interest on the loans." Second Amended Complaint, ¶ 45. These payments are characterized as the fraudulent transfers that the Trustee would avoid. Second Amended Complaint, ¶¶ 90, 96, 102, 109.

In two other counts, OppFinLLC is also identified as the recipient of a payment of $349,000.00 from PettersCB in April, 2005. The Trustee alleges that those parties denominated this as the satisfaction of a prepayment penalty; · but he maintains that OppFinLLC had no entitlement to receive it under law or the terms of any promissory note. Second Amended Complaint, ¶¶ 52–54. The Trustee seeks to recover a corresponding sum under the theories of breach of contract and fraud. Second Amended Complaint, ¶¶ 111–113, 116–123.

The Opportunity Finance Entity–Defendants and the Sabes Family Defendants are identified generally as "initial transferees of" all identified transfers by PettersCB, or "the persons for whose benefit" the transfers "were made, or immediate or mediate transferees of the initial transferee." Second Amended Complaint, ¶ 89. The Second Amended Complaint is virtually devoid of any other fact-pleading on the involvement of the Sabes Family Defendants as participants or recipients.

A third constituency within the defense side, DZ Bank is sued on the terse allegation that it "provided funding to one or more of the Opportunity Finance [Entity-] Defendants," Second Amended Complaint, ¶ 14, "to fund loans or other investments in one of Tom Petters' [sic] entities," Second Amended Complaint, ¶ 31.c. In their motions, the Opportunity Finance defendants and DZ Bank acknowledge this role. *Notice of Motion to Dismiss the Second Amended Complaint of DZ Bank AG* [Dkt. No. 48], 7–8; *Notice of Hearing and Motion to Dismiss Second Amended Complaint of Opportunity Finance* [Dkt. No. 49], 4–5. They assign the title of "senior secured lender" to DZ Bank for its participation in the lending that ultimately went to PettersCB or for its benefit. The Trustee alleges that DZ Bank "withdrew from providing [all] financing" to Tom Petters after it was "unable to obtain adequate assurances from Petters and his entities regarding the existence of the goods which were the collateral for the ... transactions." Second Amended Complaint, ¶ 31.c.[16]

The Trustee does not plead anything else as to DZ Bank's involvement in the events sued-on. His theory of liability for DZ Bank appears to lie solely in his global reference to "Defendants" in his pleading on the liability of all defendants "in addition to" OppFinLLC. By that, the Trustee seems to assert that DZ Bank was a "person[ ] for whose benefit all or part" of PettersCB's transfers were made, or an "initial transferee[ ]" or immediate or mediate transferees of" OppFinLLC. Hence, the Trustee would have DZ Bank subject to judgment in avoidance of all transfers held to have been fraudulent in their making, and equally liable for the full amount of judgment. Second Amended Complaint, ¶¶ 80–83. In a very few words, this pleading hedges all over the place on this part of the Trustee's case, in multiple permutations—either DZ Bank was a direct

---

16. This pleaded assertion is a reference to DZ Bank's *separate* engagement in senior secured lending to PCI for the ostensible, diverting transactions. Context suggests that DZ Bank's senior secured funding for the Polaroid-related transactions here did not outlast the PCI-related lending.

recipient from the transferor and hence directly liable on any fraudulent transfer; or it is liable as a subsequent transferee. That about covers the range under 11 U.S.C. §§ 550(a)(1)–(2).[17]

## MOTIONS AT BAR

### 1. Dismissal, as Originally Sought

In lieu of filing answers, the Opportunity Finance defendants and DZ Bank made motions for dismissal under Fed.R.Civ.P. 12(b)(6), *as incorporated by* Fed. R. Bankr.P. 7012(b). They structured their motions on the now-familiar argument sprung from the Supreme Court's decisions, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009): the Trustee has failed to plead facts sufficient to make out a *plausible* case for avoidance of the payments they received in 2003–2005 on the loans originally advanced for the transactions in Polaroid-branded merchandise.

In the main, the movants assert their "bankruptcy remote" structure as a bulwark against avoidance. As they would have it, the Trustee failed to recognize the actual transferor to OppFinLLC, which was PettersCB Funding. Thus, they argue, he has no pleaded claim against any named defendant because PettersCB Funding was an entity distinct from any of the Debtors, and one that had no creditors at all other than OppFinLLC or its affiliates. Thus, they maintain, the Trustee fails to adequately plead as to either actual

or constructive fraud under MUFTA: PettersCB Funding had no other creditors to actually defraud or to furnish standing under § 544(b), and there is no pleading at all on PettersCB Funding's insolvency. Further, they argue, the payments on which the Trustee sues were repayments of secured debt incurred under their "bankruptcy remote" structure; and as they would have it, such payments were not transfers actionable under MUFTA at all, or they furnished reasonably equivalent value by the abatement of antecedent and secured debt. Much of the factual predicate for these arguments does not appear within the four corners of the Trustee's complaint—the content of which is supposed to be the sole focus of a motion under Rule 12(b)(6). To dodge around this, the movants use caselaw-derived ploys to expand the record for consideration of dismissal.

### 2. Governing Legal Authority

The Eighth Circuit has applied *Twombly* and *Iqbal* many times since their issuance. Under its rulings, however, there is no change to the long-recognized, threshold approach to reviewing a complaint's allegations for their substantive sufficiency under Rule 12(b)(6):

> When evaluating a motion to dismiss, we accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the nonmoving party, …

*McDonough v. Anoka County*, 799 F.3d 931, 945 (8th Cir.2015) (citing *Richter v.*

---

17. Subject to exceptions not relevant here, this statute provides:

…to the extent that a transfer is avoided under [11 U.S.C. § ] 544, … the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—

(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

(2) any immediate or mediate transferee of such initial transferee.

*Advance Auto Parts, Inc.*, 686 F.3d 847, 850 (8th Cir.2012) (per curiam)). As before, in determining whether a complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" the court is to reject "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," and "legal conclusions couched as factual allegations." *Id.* (quoting *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937 and *Papasan v. Allain*, 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986) (interior quotes omitted)).

As noted in *McDonough*, facial plausibility is present when a complaint's "factual content ... allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." 799 F.3d at 945 (citing *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937). Determining this is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679, 129 S.Ct. 1937. This does not saddle a plaintiff with a "probability requirement at the pleading stage." *Twombly*, 550 U.S. at 556, 127 S.Ct. 1955. But nonetheless, the pleaded facts must "affirmatively and plausibly suggest that [the plaintiff] has the right [it] claims," against the defendant it has named and sued. *Stalley v. Catholic Health Initiatives*, 509 F.3d 517, 521 (8th Cir.2007) (citing *Twombly*, 550 U.S. at 554–557, 127 S.Ct. 1955).

### 3. Dismissal, as Actually Warranted

As the defense originally briefed the motions at bar, the attack on the Trustee's pleading was quite involved. Then, the issue billowed out to a massive cumber, through the Trustee's written response and the oral argument.

Much of that can be cleared out of the way, however. The defense challenges the adequacy of the Trustee's pleading in two fundamental ways. Neither defense presentation gets it quite right as to either of those aspects; but in theme and thrust they set out the track. In the end, the Trustee's theory of suit is fatally flawed. Under the facts pleaded, he does not have a right of recovery in avoidance against any of the Defendants, in his capacity in these cases.

After that, it does not appear that the Trustee can remedy the deficiencies by alternate fact-pleading. The Trustee had the onus to plead a plausible case in the first instance, and indisputable aspects of his pleading deprive him of that. These fundamental points of historical occurrence and sequence are conclusive, and they cut against any right to relief in favor of the bankruptcy estates. The Trustee cannot deny them now, for a repleading. Thus, granting leave to essay an amendment would be futile; these fundaments present an insuperable bar to relief under the only law that the Trustee cites as authority for avoidance.[18] This adversary proceeding must be dismissed, in its entirety and right now.

---

**18.** Before *Twombly* and *Iqbal*, the standard for pleading under Rule 8(a), as applied under Rule 12(b)(6), was couched by *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). It was more deferential to plaintiffs. Generally, dismissal was disfavored *unless* the plaintiff had pled allegations that showed on the face of its complaint that there was "some insuperable bar to relief." *E.g., Coleman v. Watt*, 40 F.3d 255, 258 (8th Cir. 1994); *Ring v. First Interstate Mtg., Inc.*, 984 F.2d 924, 926 (8th Cir.1993); *Bramlet v. Wilson*, 495 F.2d 714, 716 (8th Cir.1974). As a floor for adequate pleading, this was pretty minimal. *Twombly* and *Iqbal* raised the bar above that level. But, they certainly do not destroy the obvious, corollary point of this formulation: where a complaint *does* show in its fact-pleading "some insuperable bar to relief," it is to be dismissed without granting an opening for an attempted revival under other facts.

## ANALYSIS

### I. The Trustee's Standing to Seek the Avoidance of Transfers Made by PettersCB, a Non–Debtor Entity (Counts I—IV)

#### A. The Issue—As Framed by the Parties, as Reidentified by the Court

Under the turmoil of the parties' massed arguments there is a threshold issue with the Trustee's pleading: his *standing* to sue these defendants under his pleaded theory of suit.

The use of that word is a little misleading, since there is the independent, constitutionally-founded requirement of standing under Article III to bring suit in the federal courts.[19] Here, a different standing requirement is statutorily-based and specific to the law of bankruptcy. The question that jumps out from the Trustee's pleading is: how does *this* plaintiff-trustee, as the steward of the bankruptcy estates of specific corporate entities, have standing to sue for the avoidance of the transfers that he identifies in his pleading—payments of money made by or out of a corporate entity (PettersCB or PettersCB Funding) that was not itself among the companies that were eventually put into bankruptcy to commence the cases in which this adversary proceeding was brought? The Trustee's fact-pleading featured almost nothing toward that issue.

The Opportunity Finance defendants drove at something like this, when they challenged the Trustee by arguing a theory premised on the presence of PettersCB Funding as a "bankruptcy remote vehicle" in the chain of transactional participants. But neither grouping of defendant-movants challenged the Trustee's standing at the lower level where it seemed to arise— at an asserted participant-nexus *through* *PettersCB*, as the ostensible originator of the value transferred that now was to be recovered and as the designated entity that would have conveyed that value in a fraudulent transfer.[20]

This point was raised *sua sponte* from the bench at oral argument. The Trustee's counsel had to scramble to respond, and the response was none too clear. With that little input, this issue of standing was left hanging. Nonetheless, there is enough before the court to enable a treatment. Not the least, this is because the Trustee's pleading on this most basic level is so deficient, there is not much to say for it—and he could not replead in the alternative without unjustifiably contradicting the original.

---

19. *See Braden v. Wal–Mart Stores, Inc.*, 588 F.3d 585, 591 (8th Cir.2009) (discussing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).

20. To summarize what was noted earlier: the Opportunity Finance defendants' argument was that PettersCB Funding would have been the transferor on any payment made on a debt to OppFinLLC, under the terms of the "bankruptcy remote" structure that OppFinLLC had required of Tom Petters before it would lend on these transactions. PettersCB Funding was deliberately set up to be an entity permanently without debt to outside, third-party creditors; so, the movants insist, there never could have been a "predicate creditor" that could have sued OppFinLLC outside of bankruptcy; and hence the Trustee could not have been empowered under § 544 to sue any recipient of payment from funds that originated in PettersCB's business transactions. This argument did point out a gap— but it was at a higher level, under the statutory requirement of a predicate creditor that would furnish a trustee the derivative status of plaintiff. And, it tacitly assumed that the Trustee could take his standing through PettersCB or PettersCB Funding—the unrecognized point of elision in the Trustee's theory of suit.

This issue springs from the very fundament of the liquidation process in bankruptcy. The bankruptcy estate is a creation solely of statute, 11 U.S.C. § 541. Its steward, the trustee, is likewise empowered solely by statute. Generally speaking, trustees under Chapter 7 have the power to garner money and property into the estate for administration from two different sources in law. *In re Ozark Rest. Equip. Co., Inc.*, 816 F.2d 1222, 1224–1226 (8th Cir.1987). The first is not relevant at this point.[21] The second is the recovery via statutory avoidance pursuant to Chapter 5 of the Bankruptcy Code, of assets transferred from the debtor's possession, ownership, or right, voluntarily or involuntarily, before the bankruptcy filing. Such transfers must be of the sorts specified in the avoidance statutes. *E.g., In re Ozark Rest. Equip. Co., Inc.*, 816 F.2d at 1226 and 1229 (discussing "strong arm" avoidance empowered under 11 U.S.C. § 544(a)(1) and separate avoidance provision of 11 U.S.C. § 544(b)).[22]

The Trustee here asserts that 11 U.S.C. § 544(b) empowers him to avoid the payment-transfers he identifies in his complaint. He, however, is the steward of the estates of the Polaroid-related entities that are in bankruptcy in the underlying cases. That circumstance goes to the key point—which is that a trustee's empowerment under § 544(b) to avoid transfers *must derive from the right of a specific creditor of the debtor that is in bankruptcy* in the case from which a particular avoidance proceeding is sued. *In re Petters Co.,*

*Inc.*, 495 B.R. at 895 (citing *In re Marlar*, 267 F.3d at 753). Such a predicate creditor must have held an unsecured claim cognizable *in that debtor's* bankruptcy case as of the relevant date—that is, as of the time of that debtor's bankruptcy filing. *In re Petters Co., Inc.*, 494 B.R. at 441.

Under bankruptcy law, a claim is a "right to payment." 11 U.S.C. § 101(5). To confer standing on a trustee under § 544(b), the claim must have a requisite solidity; it must be allowable as conceived by bankruptcy law—i.e., it must entitle its holder to receive distribution from the bankruptcy estate. *In re Petters Co., Inc.*, 495 B.R. at 895 (citing *In re Wintz Cos.*, 230 B.R. 848, 859 (8th Cir. BAP 1999)). At minimum, allowability rests on a pre-petition legal enforceability "against the debtor and property of the debtor." 11 U.S.C. § 502(b)(1) (providing for disallowance of a claim that is "unenforceable against the debtor and property of the debtor"). And it goes without saying that "the debtor" against which a claim is to be enforceable for allowance, is perforce *the* debtor, individual or corporate, that is in bankruptcy through the underlying case. Thus,

to exercise her § 544(b)(1) avoidance power, the trustee must show that the transfer is voidable under state law by at least one unsecured creditor of the bankruptcy estate with an allowable claim.

*In re Marlar*, 267 F.3d at 753.[23]

The Trustee filed his Second Amended Complaint in the wake of these various

---

21. That would be pursuant to 11 U.S.C. § 704(1), the direct resort to assets that were in the possession, ownership, or right of the debtor as of the bankruptcy filing. 816 F.2d at 1224–1225. Such assets pass into the bankruptcy estate by operation of 11 U.S.C. § 541(a)(1), and hence are subject to a trustee's administration immediately.

22. In the same opinion, the Eighth Circuit rejected the notion that the vesting of a general equitable power in the court under the "all-writs act" of 11 U.S.C. § 105(a) was a third, independent source of substantive empowerment to sue. 816 F.2d at 1230.

23. This all flows directly from the language of the statute, quoted *supra* at p. 891, n.8.

rulings. He seemed to take special pains over the directive in the Second Memorandum in the PCI litigation, that a trustee suing under § 544(b) had to "identify by name," one creditor or more "whose standing he uses to sue" the particular defendant, "which creditor would have had the right to sue to avoid that transfer on the date that that [d]ebtor filed for bankruptcy relief." 495 B.R. at 901.

And what does the Trustee plead to meet this requirement for his statutory standing? As follows:

> At all times material hereto, there was and is at least one creditor who held and who holds unsecured claims *against PCB* that were and are allowable under Bankruptcy Code § 502 or that were and are not allowable only under Bankruptcy Code § 502(e). By way of example, and not by way of limitation, such creditors are United Parcel Service, Hewlett–Packard Financial Services Company, NSTAR Electric Company, TW Telecom, Inc., Roadway Express, Agilysys, Inc., Custom FAQs Solutions Ltd, Microsoft Corporation and Microsoft Licensing, GP, AT & T Corp., Norwood Municipal Light Department, Wanlida Group Co., Ltd., *and other creditors listed on the Schedule F as undisputed obligations of Polaroid Corporation.* Pursuant to 11 U.S.C. § 544(b)(1) the Trustee may avoid the Transfers *because the Transfers are avoidable under applicable nonbankruptcy law by a creditor holding an unsecured claim in the bankruptcy case.*

Second Amended Complaint, ¶¶ 87, 92, 98, 104 (emphasis and double-emphasis added). Yet, earlier in the same paragraphs, the Trustee asserts that

> At all times material hereto, there was and is at least one creditor who held and who holds unsecured claims *against PCB* that were and are allowable under Bankruptcy Code § 502 or that were and are not allowable only under Bankruptcy Code § 502(e).

*Id.* (double-emphasis added). This is the Trustee's basis for the ensuing reference-back to "such creditors." As noted, earlier in his Second Amended Complaint the Trustee set up "PCB" as a *collective* reference to PettersCB *and* Debtors Polaroid Holding Company and Polaroid Consumer Electronics, LLC. This appears to stem from his conclusory assertion that Polaroid Holding Company and Polaroid Consumer Electronics, LLC "are the successors in interest to" PettersCB. Second Amended Complaint, ¶ 1.

But ... every last bit of the Trustee's pleading of historical fact supports only one possible inference: there were only two possible actors as transferor in the string of transfers on which he sues, *PettersCB or PettersCB Funding,* in their individual corporate right. And this could be no other way; every last impugned payment is dated to a time before Tom Petters acquired the Polaroid enterprise in April, 2005. Every one is said to have been made by, or through, PettersCB or the related PettersCB Funding.

Both of those entities are said to have been within Tom Petters's own enterprise structure. Second Amended Complaint, ¶ 5. Likewise, Polaroid Holding Company and PCE came within Tom Petters's enterprise structure ... *eventually.* But, despite the mumbling-together of these two Debtors and PettersCB under the muddled pleading-tag of "PCB," the Trustee never alleges that Polaroid Holding Company and PCE were actually involved as transferors or chain-participants, for a single one of the impugned transfers. So even though the pleading defines its abbreviation of "PCB" as including these three very different entities "collectively," the only rational way to interpret the Trus-

tee's pleading of historical fact is to identify PettersCB as the one entity possibly identifiable as the transferor, under the Trustee's theory for all of the claims at bar.[24]

Further clouding the waters, the Trustee generally identifies "the detriment [to] PCB's creditors" as the result of "the use of PCB by its *ultimate* owner, Thomas J. Petters." Second Amended Complaint, ¶ 19 (emphasis added).

## B. Outcome on the Fundamental Issue

■ In the most direct sense of the problem at bar: the Trustee can not have standing, in the sense of a fiduciary-plaintiff empowered by bankruptcy law to sue for the avoidance of any transfer made by PettersCB or by PettersCB Funding. Neither of those entities are among the Debtors in the underlying cases in which he serves as a steward of the estates.

Hence the Trustee has no legal status at all, directly as to PettersCB or PettersCB Funding, their creditors if any, and any aspect of their past business activity.[25]

The Trustee's terse, conclusory identification of two of the named Debtors as "successor in interest" to PettersCB does not fill this void. In the first place, there is no pleading for this adversary proceeding, as to any transactional sequence through which they would have become "successors in interest" to PettersCB in any way. The Trustee does not allege a merger of whole entities, a conveyance of assets or assignment of attributes, a substitution of contractual parties through novation, or otherwise. During the Trustee's fleeting proffer at oral argument, it was suggested that merger was the vehicle; but from that it was quite unclear as to which entities would have been melded by merger and to what consequence.[26]

24. The Trustee alleges that the creation of PettersCB Funding in mid–2003 and its presence in the transactional chain after that were essentially a sham, because OppFinLLC and PettersCB never treated it as a separate corporate entity in the way they funneled funds to and fro. Second Amended Complaint, ¶¶ 47–51. He thus pleads as if PettersCB was the transferor-in-fact. All of the defendants insist that PettersCB Funding must be treated as the transferor because of their contractual structure for bankruptcy-remoteness. They do not acknowledge a possibility that the Trustee insinuates: in the rapid-fire, multiple exchanges of money that Tom Petters favored, other participants may have jumped over PettersCB Funding for at least some transfers, making payments directly to PettersCB notwithstanding the niceties of the structure. For present purposes, it is not necessary to get into this dispute.

25. This sets aside the possibility that PettersCB Funding did not even have corporate existence when any of the Debtors filed for bankruptcy, or when the Trustee sued out this adversary proceeding. *See* Certificate of Cancellation of PCB Funding, LLC, Exh. 3 to Opportunity Finance Motion for Dismissal [Dkt. No. 49]. (The Opportunity Finance de-

fendants slipped in this document under the guise of being "necessarily embraced by" the Trustee's pleading, and therefore properly considered on a motion under Rule 12(b)(6). Generally speaking, defendants moving for dismissal under Rule 12(b)(6) take excessive liberties in using this ploy to stretch the content of the record. *In re Petters Co., Inc.*, 532 B.R. 100, 116 (Bankr.D.Minn.2015). However, since the issuance of *Porous Media Corp v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999), local precedent has furnished a rationalization for the practice.)

26. The structural process of the acquisition was described in the complaint in a different adversary proceeding, one brought jointly in the Petters Company, Inc. and Polaroid Corporation cases:

In April 2005, [the] Polaroid Corporation became a wholly-owned subsidiary of PGW pursuant to a merger between [the] Polaroid Corporation's then-parent corporation, Polaroid Holding Company and Petters Consumer Brands, LLC.... PCB was a wholly-owned subsidiary of PGW. *Kelley, et al v. JPMorgan Chase & Co., et al*, ADV 10-4443 [enumeration in PCI cases] and

But to get to the crucial issue at bar, it can be assumed that there was such a merger, and either Polaroid Holding Company or PCE was the resulting successor.[27] If the Trustee then is suing on behalf of the estates of one or both of those Debtors, the fundamental flaw emerges as to his invocation of MUFTA against these transfers.

■ MUFTA's remedies are "[d]esigned to 'prevent debtors from placing property that is otherwise available for the payment of their debts out of the reach of their creditors....'" *Finn v. Alliance Bank,* 860 N.W.2d 638, 644 (Minn.2015) (quoting *Citizens State Bank Norwood Young Am. v. Brown,* 849 N.W.2d 55, 60 (Minn.2014)). Under the rationale of Minnesota's fraudulent transfer law outside of bankruptcy, avoiding transfers that are otherwise final under general law is justified when the assets transferred would have been available for the satisfaction of the claims of the suing creditor, voluntarily or involuntarily. Minn.Stat. §§ 513.47(a)(1) (allowing creditor-plaintiff under MUFTA to "obtain ... avoidance of the transfer ... to the extent necessary to satisfy the creditor's claim"), 513.47(b) (allowing creditor that "has obtained a judgment on a claim against the debtor," to "levy execution on the asset transferred or its proceeds") (both 2014).

And under MUFTA, a creditor suing for avoidance must itself establish standing to sue in avoidance, in the sense of having a legally-enforceable right to payment from the debtor. Minn.Stat. §§ 513.44(a) (defining transfers that are "fraudulent as to a creditor" whose "claim arose before or after the transfer was made"), 513.45 (defining transfers that are "fraudulent as to a creditor whose claim arose before the transfer was made"), 513.41(4) (defining "creditor" as "a person who has a claim"), 513.41 (defining "claim" as "a right to payment," broadly framed by numerous non-limiting characteristics).

When these requisites for creditor-standing under MUFTA are recognized, the flaw gapes wide open in the Trustee's pleaded notion of his own standing. It is best-expressed by a question: in December, 2008, how could a creditor of *Polaroid Holding Corporation or PCE* have justified reaching back beyond the line of April, 2005, to sue a transferee *of PettersCB*? The absurdity of the notion is clear, if such a creditor held a claim that arose from direct contractual privity between it and Polaroid Holding Corporation or PCE. A transfer made by PettersCB years earlier would not have deprived such a creditor of anything at all, to which it could have

10-4444 [enumeration in Polaroid Corporation cases], Complaint [Adv. 10-4444, Dkt. No. 1], ¶ 3. The pleading in that lawsuit is not part of the pleading in this one, obviously; hence it cannot be deemed to this proceeding if adequacy under Rule 12(b)(6) had to reach this point of fact-pleading. The plaintiff-Trustee in the matter at bar is a joint plaintiff there. It is not known why these simple averments were not reprised somewhere in the three successive versions of a complaint here.

27. It logically could not have been both: how could a corporate body split but then directly *merge* parts of it as distinct entities with more than one preexisting, separate corporate

body? And if per the cited pleading in ADV 10-4444 Polaroid Holding Company nested into PGW's enterprise structure, i.e. by a merger with PettersCB, how did the separate entity of PCE become a "successor in interest" to PettersCB in a legally-cognizable way? PCE, a distinct corporate entity, is a subsidiary of the Polaroid Corporation-which in turn would be a subsidiary of Polaroid Holding Company. The Trustee's failure to plead any factual basis for a succession is ever more vexing. And this all makes the Trustee's little flourish of pleading seem ever more facile—i.e. his *collective* definition of his pleading-tag "PCB" for assertions of historical fact and his tersely-worded identification of *both* of the Debtors as "successors in interest."

justifiably looked for satisfaction of its claim against its own debtor (Polaroid Holding Corporation or PCE).

Looking far afield of that direct scenario, a set of facts can be envisioned that would structure-out under the Trustee's premise that Polaroid Holding Corporation or PCE are objectively-traceable successors in interest to the named transferor, PettersCB. This would require a very specific stacking of historical events, however:

1. The creditor's claim accrued before Tom Petters's acquisition, as a result of direct contractual privity between it and PettersCB or PettersCB Funding.

2. The claim would have accrued during the period of the challenged transfers, or at least before PettersCB and PettersCB Funding passed out of the picture by merger or dissolution.

3. The creditor's claim was not paid timely under its own terms.

4. The creditor's claim was not satisfied before Petters CB was merged into Polaroid Holding Company and PettersCB Funding was dissolved.

5. The liability on the debt was expressly preserved and passed to one of the Debtors as part of the complex of transactions through which Tom Petters changed his alignment with the Polaroid enterprise by acquiring that enterprise in full.

To be legally viable, however, such a succession of creditor-entitlement would require an express, objective undertaking by all involved parties. Under the general principles of contract law, an enforceable passage of a liability of PettersCB could not have occurred by the unilateral doing of Tom Petters through his entities' acts; it would have required objectively-manifested consent of all three parties to the crucial fifth step, through a novation of

some sort. This would include the creditor. *Hanson v. Nelson*, 82 Minn. 220, 84 N.W. 742, 743 (1901) (for novation in substitution of contractually-bound parties to be effective, consent must be explicitly expressed by all parties, those originally signatory and those to be substituted in); *Cornwell v. Megins*, 39 Minn. 407, 40 N.W. 610, 611 (1888) (consent to substitution of parties to contract must go to the release of original party *and* to assumption by substituted party); *Epland v. Meade Ins. Agency Assocs., Inc.*, 564 N.W.2d 203, 207 (Minn.1997) (for substitution of party by novation to be effective against counterparty, counterparty must have consented "to the delegation, thus completely substituting one party for another").

This sequence of events would not have been entirely impossible. But how plausible is it, that it would have occurred? Lenders or trade suppliers generally make their decision to extend credit based on the worthiness of the specific party they are dealing with; and after that is done, and a debt created, it is more likely that they would take a proffered merger as an opportunity to get clear on the account, even if they countenance doing business with the new entity in the future. A thorough vetting of the incoming merger-partner might override the natural motivation to get an existing credit paid off and then start from even. But absent that, it is just not plausible that novations would have been suffered by the creditors of PettersCB, expressly or implicitly.

And more to the point of the motions at bar: the Trustee pleads absolutely nothing, to support a legal status as successor-in-interest for either of the two named Debtors, with actual novations or otherwise. The Trustee does plead other facts going to standing. But, they cut in a different direction—and that one is even more wrong. The predicate creditors ac-

tually named in the Second Amended Complaint are not even identified through Polaroid Holding Corporation and PCE as their liable debtors. *They are specifically identified as scheduled creditors of the Polaroid Corporation.* The Polaroid Corporation, however, is not in the factually-pleaded firmament as an actual transferor—or even as an ostensible successor-in-interest to an actual transferor, under the Trustee's stretched but gapped theory of suit.

As a result, there is no basis in the Trustee's present fact-pleading on which to accord him statutory standing to sue the defendants on transfers they received from PettersCB.[28] PettersCB is not in bankruptcy, and hence the Trustee does not stand as a fiduciary-steward with power to sue in relation to it, its assets, or its transactions. There is no fact-pleading at all on which to conclude that a creditor of any of the three Debtors named in the complaint could have sued in avoidance of past transfers by PettersCB. There is no fact-pleading at all on which any of the three Debtors would have legally succeeded to PettersCB as a debtor liable to any of PettersCB's creditors. One cannot envision a plausible sequence of events on which they would have succeeded to that specific status. For such an extraordinary proposition, the Trustee had to name a creditor identified to either of the two Debtors he would have considered as successors to PettersCB, as the predicate creditor from which he would derive standing. He does not do so. The Debtor from which he does offer predicate creditors is not one of the two he identifies as a successor-in-interest to PettersCB.

This multiple layering of defects on the threshold issue of standing is fatal to Counts I—IV of the Trustee's complaint. Those counts fail to state a claim on which

relief under MUFTA might be granted to the Trustee as to the transfers he sues on. This merits dismissal under Rule 12(b)(6). It is not possible to conceive of any alternate set of facts to set up standing for the Trustee, absent irreconcilable conflict with the historical facts already pleaded. That means that a grant of leave to amend would be futile. So, the dismissal of all counts founded on MUFTA must be with prejudice.

## II. Bankruptcy Estates' Right to Sue on Claims Under State Law (Counts V—VI)

■ Under two other counts of his Second Amended Complaint, the Trustee seeks a recovery on a single, separate, discrete payment made—in the amount of "approximately $349,000.00," disbursed to OppFinLLC on April 27, 2005, "as a prepayment penalty." Second Amended Complaint, ¶ 52. He does not allege in so many words that this payment was made in connection with the Opportunity Finance–PettersCB financing relationship. But there is a reference to how the "notes upon which the Prepayment Penalty Transfer was made ... expressly provided for prepayment without penalty," Second Amended Complaint, ¶ 54, and the Opportunity Finance–PettersCB relationship involved lending, in very large total amounts, Second Amended Complaint, ¶¶ 43–44. The Trustee does not ever state that the lending was documented through promissory notes. But one can assume that was done; this would have been the only commercially-reasonable way to handle it. Thus the place of this payment within that broader financial relationship is inferred as an additional assertion of fact.

That is the only pleading of fact on this cause of action. From there, it gets com-

---

**28.** For that matter, he would lack Article III standing on the same analysis.

plicated on the plane of substantive legal theory.

In Count V, the Trustee characterizes the extraction of this payment as a breach of contract. The assertion is that the underlying notes on which OppFinLLC demanded payment "expressly recited that there would be none," i.e. any prepayment penalty. Second Amended Complaint, ¶¶ 111–113.

In Count VI, the Trustee pleads that OppFinLLC "represented [to PettersCB] that $12,039,403.78 was owed to [OppFinLLC] on the Prepayment Penalty Notes, $349,000 of which amount was a prepayment penalty." Second Amended Complaint, ¶ 116. He then characterizes this demand as a statement of "then-present, material fact that was capable of being known by" OppFinLLC, Second Amended Complaint, ¶ 118; that was false, Second Amended Complaint, ¶ 117; that was made by OppFinLLC with knowledge of its falsity, Second Amended Complaint, ¶ 119; that was "reasonably and foreseeably relied upon" by PettersCB, inducing it to make the payment, Second Amended Complaint, ¶¶ 120–121; and that PettersCB was damaged by the loss of the funds paid on the demand, Second Amended Complaint, ¶¶ 122–123.

So much for the fact-pleading for Counts V and VI. Facial persuasiveness aside, they seem to be simple claims under the common law for money damages. It gets a little confusing in the Trustee's prayer for relief, however. Citing a mash-up of ¶¶ 544(b), 550(a), 551, and "the common law of Minnesota," the Trustee categorizes his desired relief as:

(a) avoiding the Prepayment Penalty Transfer, including but not limited to an avoidance of all of the obligations and pledges of assets made in favor of Defendants;

(b) preserving the avoided Prepayment Penalty Transfer for the benefit of the bankruptcy estate; and

(c) awarding a money judgment in favor of the Trustee against Defendants in the amount of the Prepayment Penalty Transfer, plus pre- and post-judgment interest, and costs and disbursements. . . .

Second Amended Complaint, Prayer for Relief, ¶ C. Then an odd little request strays in. It cannot be matched to any of the fact-pleading and it is facially nonsensical:

On all Claims for Relief, establishment of a constructive trust over the proceeds of the Transfers in favor of the Trustee for the benefit of *PCB's* estate. . . .

Second Amended Complaint, Prayer for Relief, ¶ D (emphasis added).

Counts V and VI fail to state a claim on which relief may be granted to the Trustee, postured as he is in his fiduciary status for the Debtors' estates. There are two reasons and they are qualitatively different.

The first is technical in orientation. It goes to the substantive sensibility of these counts' pleading, and it goes back from the end. As to Counts V—VI, the Trustee's full prayer for relief is blather—an anomalous and gratuitous slathering of the language of avoidance remedies over simple fact-pleading for common-law causes of action. One cannot even speculate why all that was added. Not a bit of the pleaded fact for Counts V and VI matches to any substantive requirement under MUFTA.

The second goes back to the Trustee's bedrock statutory standing, though the pivotal point is different due to the pleaded substantive basis for recovery under these counts. Postured as they are—claims for damages under nonbankruptcy law—Counts V and VI are the sort of thing that

a trustee in bankruptcy can sue out. But, a trustee suing on causes of action pled on broad narratives like these does so under the first empowerment noted *supra*, n.21: in administration of an asset—a cause of action—that accrued to a debtor pre-petition and then passed into the estate upon the bankruptcy filing. *E.g., In re Senior Cottages of Am., LLC*, 482 F.3d 997, 1001 (8th Cir.2007); *United States ex. rel. Gebert v. Transport Admin. Servs.*, 260 F.3d 909, 913 (8th Cir.2001); *Wolfe v. Gilmour Mfg. Co.*, 143 F.3d 1122, 1126 (8th Cir. 1998); *Whetzal v. Alderson*, 32 F.3d 1302, 1303 (8th Cir.1994); *In re Ozark Rest. Equip. Co., Inc.*, 816 F.2d at 1225 (all standing for general proposition that pre-petition causes of action in favor of debtor pass into bankruptcy estate by operation of § 541(a)).

However, the Trustee's pleading does not and can not establish that *these* causes of action passed into the bankruptcy estates of any of the named Debtors. Any injury and harm under the described facts (breach of contract, fraudulent inducement, resultant damages) would have been inflicted in 2005 on *PettersCB, not* on any of the named Debtors. PettersCB did not go into bankruptcy in its own right. It is not in bankruptcy as a debtor-entity in any of the cases within the *Polaroid Corporation* group. The Trustee's bald assertion that two Debtors are currently successors-in-interest to PettersCB does not fill the gap in a chain of right—both for the reason treated earlier (no pleading as to how that would have happened) and because there is no separate fact-pleading as to how PettersCB's loss of the monies would have legally injured or factually harmed either Debtor, *years afterward*. There is no plausible basis in the Trustee's pleading of fact through which either Debtor would have held these particularized causes of action when they filed for bankruptcy, to pass into their estates on those filings.

The Second Amended Complaint does not state a claim on which relief under Counts V and VI could be granted in favor of any of the Debtors' bankruptcy estates, and in particular for the Polaroid Holding Corporation and PCE estates. Again, the circumstances do not warrant giving the Trustee another chance to plead additional factual basis for a specific succession of property rights in claims against third parties, from PettersCB to either named Debtor. The Trustee had three opportunities to flesh out a defensible structure for asserting these claims. None of the versions of his complaint shows any more thought as to how he was empowered to sue on them. Thus, Counts V and VI are to be dismissed, with prejudice and without grant of leave to further (fourth) amend.

### III. Avoidability of Transfers Made by PettersCB on Financing Transactions with Opportunity Finance Defendants, as a Substantive Matter

■ Its pleading on standing aside, the Second Amended Complaint still founders under Rule 12(b)(6). On the pleaded facts, its fraudulent transfer claims fail on their substance. This follows from the Minnesota Supreme Court's most recent application of MUFTA, *Finn v. Alliance Bank*. *Finn*'s precedential rulings apply on-point to the pleaded transactional facts here.

*Finn*'s holdings are fact-driven. They spring from the specific factual content of the pleadings or the evidence that was presented to the trial court in that case.[29]

---

29. *Finn* came out of avoidance litigation brought by the receiver for a failed business entity that had been the vehicle for a Ponzi scheme. The opinion in *Finn* was issued on consolidated appeals involving two different defense constituencies in the lawsuit. 860 N.W.2d at 643–644. One was an appeal from a grant of summary judgment in favor

However, the material factual aspects of *Finn* do not differ from the transactional history pled here. Given *Finn*'s pronouncements on its very specific matrix of fact, the Trustee's case for avoidance fails right on the face of the Second Amended Complaint. This occurs under both statutory variants of fraudulent transfer, for actual or constructive fraud.

The major *Finn*-driven shortcoming blazons early in the Trustee's complaint:

> ... For example, *unlike many of Tom Petters' companies, PCB actually purchased, warehoused, and sold* to prominent retailers high volumes of consumer electronic equipment, branded with the "Polaroid" name[,]

Second Amended Complaint, ¶ 24 (emphasis added); and

> PCB used such money, credit, or purported assumptions of debt *to purchase consumer electronics for resale to retailers* like Best Buy or to cause payments to third parties claiming rights in, or otherwise concerning, such consumer electronics[,]

Second Amended Complaint, ¶ 41 (emphasis added).

The description of transactional fact here is declarative and unequivocal. Paragraph 46 of the Second Amended Complaint describes a structure through which the financing, acquisition and sale of consumer-goods inventory, accounts receivable, collection, and the eventual repayment of OppFinLLC were to be administered toward the intended "bankruptcy remoteness," contrived to insulate OppFinLLC from liability in avoidance. Then, as a flat statement of historical events over the course of the two-year relationship, the Trustee describes the actual use of the structure, or parts of it, to lend monies out of OppFinLLC, toward PettersCB's actual acquisition of real goods. There are the two statements of general historical fact in ¶¶ 24 and 41. Then there is:

> Contrary to the plan, the Consumer Goods Loan advances were given directly to PCB, not to PCB Funding.

Second Amended Complaint, ¶ 49.[30] The Trustee uses concrete terms to describe an actual flow of the funds back to OppFinLLC after the real-life goods were liquidated and the associated third-party accounts receivable were reduced to cash:

> Regardless of whatever theoretical efficacy the plan might have had, however, Opportunity Finance, PCB, and PCB Funding did not follow it. . . . When Opportunity Finance swept the PCB Funding bank account to pay itself the principal and interest due on its loans, Opportunity Finance returned the excess—*i.e., what should have been profit belonging to PCB Funding on PCB Funding's purchase of the accounts receivable from PCB*—to PCB, not to PCB Funding. Thus, whatever the paperwork might have said, the parties did not treat PCB Funding as the owner of the accounts receivable. This means that the transfer of the proceeds of the accounts receivable was made directly to

---

of the receiver and against a single defendant-recipient. The other was an appeal from the dismissal of the receiver's action against a separate group of defendant-recipients. The rulings on that motion had addressed the adequacy of the receiver's pleading, plus a statute-of-limitations issue. Factual sufficiency thus was at issue in both of *Finn*'s consolidated appeals; but the factual content was lodged in different niches in the sequence of the litigation process. 860 N.W.2d at 655.

**30.** The reference "PCB" obviously signifies PettersCB alone. It could not possibly be the collective, pleading-specific abstraction of the two Debtors and PettersCB.

Opportunity Finance by PCB, not PCB Funding. . . .

Second Amended Complaint, ¶ 48 (emphasis added).

That much is overtly acknowledged about PettersCB engaging in actual merchandise transactions in real life, financed by the lending from OppFinLLC. More crucially, the Trustee's fact-pleading on PettersCB's transactions with OppFinLLC lacks something else. The Trustee never alleges that any of the money PettersCB borrowed from OppFinLLC was diverted *away from* real transactions in Polaroid-licensed merchandise, in fraud of OppFinLLC or any other person or entity. He never pleads that money originated by OppFinLLC was funneled through PettersCB *into* the main churn of Tom Petters's Ponzi scheme—the activity that Tom Petters carried on through the core of PCI, broadly pretensed on non-existent "diverting" transactions in ostensibly-preexisting consumer merchandise inventory. Nor does he ever accuse Tom Petters of using a separate scheme-structure like PCI's in 2004–2005, that would have been centered around an exploitation of the Polaroid brand and maintained to defraud lender-investors under a specific pretense of dealing in Polaroid-branded merchandise.[31]

To coin a colloquialism in resonance with *Finn*, it all pleads as legit, in the transactional backdrop. The Trustee cites only one external term of the loans from OppFinLLC as anomalous in his estimation, or out of line with a fair exchange of equivalent value: the interest rate ultimately borne by PettersCB, said to have been "12% per annum." Second Amended Complaint, ¶ 63. The Trustee impugns this as excessive, "substantially [greater than] the market rate" for such transactions. Second Amended Complaint, ¶¶ 64, 67. But that is only a conclusory pronouncement; the Trustee does not quote actual contemporaneous, prevailing market rates for similar lending, to make out the excessiveness. Without that, it seems as if the accusation was made in order to reinforce the ensuing characterization: the aggregate interest was "false profits" paid to OppFinLLC. Second Amended Complaint, ¶¶ 65, 67.

In context, "false profits" is a loaded phrase. Trustees in Ponzi-scheme cases use it as boilerplate argument for a specific aspect of the payment of interest out of a Ponzi scheme. In this parlance, "false profits" received by a transferee are said to be paid by using stolen money-cash infusions from later-defrauded investors—to satisfy earlier-maturing obligations to other investors for interest or dividends. In this latter-day usage, the phrase "false profits" is wielded evocatively, to draw a sharp distinction from the genuinely-earned fruits of business investments in the real world. Ponzi scheme perpetrators use the pretense of that to induce new investors to pay in; hence the notion of payments received from a scheme's fraudulent churn as derived from "falsity."

But the Trustee here does not use the term for the situation for which it was crafted. Rather, he slaps it onto the return on investment from financing genuine deals, on the sole pleaded ground that the rate on the lending was somehow excessive, predatory. He also tries to impugn PettersCB's engagement in actual deals as a part of a broader pretense, to draw investors into the fraudulent operations

---

31. As noted earlier, the pretense of investing by lending to support ostensibly-profitable retainer-to-retailer flips of consumer merchandise has been alleged as the vehicle of the Ponzi scheme that Tom Petters carried on through PCI.

*elsewhere* in Tom Petters's enterprise structure.

The Trustee pleads this toward a key statutory element of the theory of constructive fraud under MUFTA, a lack of reasonably equivalent value received by PettersCB for the transfer of monies to OppFinLLC in payment. Minn.Stat. §§ 513.44(a)(2) and 513.45(a) (2014). The nexus between these facts and the law, however, is none too clear from the Trustee's complaint as a whole.

At one point, Second Amended Complaint, ¶ 40, the Trustee seems to invoke the third component of the Ponzi scheme presumption as it was later divided out in *Finn,* "that any transfer from a Ponzi scheme was [conclusively] not for reasonably equivalent value," 860 N.W.2d at 646.[32] At several others, the insinuation is broader: PettersCB could not have re-ceived reasonably equivalent value from repaying a lender on *any* loan to it, legitimately contracted and used or not. The way the Trustee pleads the facts, PettersCB could not have defensibly entered into any borrowing transaction, because it could not succeed in the long term under its business plan: PettersCB "consistently lost money and ran at a net loss"; it "could not realistically expect to make a profit" due to high costs, poor product quality, and shrunken margins industry-wide; and it "was destined to fail ... and ultimately and inexorably did fail." Second Amended Complaint, ¶¶ 37-39.[33]

The *Finn* court rejected a Ponzi scheme presumption across the board, as to all three of the component presumptions it gleaned from the earlier analysis by the Minnesota Court of Appeals. 860 N.W.2d at 648–649 and 653. The rejected component relevant here was a "require[ment] to

---

**32.** This is suggested by the Trustee's choice of language to make a link between PettersCB's borrowing and the general Petters Ponzi scheme: "From 2003 through 2005, Tom Petters caused PCB to obtain money or credit from Opportunity Finance, or to assume purported obligations of others to Opportunity Finance, all in furtherance of the Ponzi scheme." Second Amended Complaint, ¶ 40. Under the enunciation of the Ponzi scheme presumption in earlier federal jurisprudence, potential avoidability under the presumption was limited to transfers "in furtherance of" a Ponzi scheme. *In re Polaroid Corp.,* 472 B.R. 22, 35–36, 53 (Bankr.D.Minn.2012), *aff'd on other grounds, Ritchie Capital Mgmt., LLC v. Stoebner,* 779 F.3d 857 (8th Cir.2015); *In re Petters Co., Inc.,* 495 B.R. at 907–908 (collecting circuit-level opinions in which the presumption was framed with this language). The causal nexus suggested by the notion of "furtherance" is a significant limitation on the scope of transfers subject to avoidance after application of the presumption. The *Finn* court does not acknowledge that. *Finn* never explicitly addresses the significance of the phrase. This nonrecognition is also evidenced in the looser and more connotative language *Finn* uses to put its subject transactions into the context it constructs. *E.g.,* 860 N.W.2d at 656 (terming investment into genuine, bona fide financing transaction placed by defendant with counterparty that was also a Ponzi scheme purveyor, "a part of a greater Ponzi scheme"—when arguably it was not "part of" the scheme at all); 860 N.W.2d at 650 (terming source of payments to investor-participant as "Ponzi-scheme proceeds," despite repeated emphasis on real-life existence of underlying transaction and pointed observation that success of underlying transaction furnished a means to fund repayment to investor-participant).

**33.** At least in isolation, implications of this notion are mind-boggling. If a corresponding rule of law were adopted, it would have a far greater sweep in the bankruptcy arena than the Ponzi scheme presumption could ever have. Just think of the number of business enterprises that end up in bankruptcy because they were originally launched with shoddy organization, flawed analysis and forecasting, poorly-founded business plans, or inept management. Is every lender to such borrowers to be subject to the avoidance of payments made to them, merely because hindsight suggests that failure was "destined" and "inexorabl[e]"?

presume that any transfer from a Ponzi scheme was not for reasonably equivalent value." 860 N.W.2d at 646. The rejection followed from the way *Finn* redirected the focus of fraudulent-transfer analysis for a failed Ponzi scheme, "on[to] individual transfers, rather than a pattern of transactions that are part of a greater 'scheme'." 860 N.W.2d at 647. The "nature of the inquiry under MUFTA" is to be "asset-by-asset and transfer-by-transfer," requiring proof of "the elements of a fraudulent transfer with respect to each transfer rather than relying on a presumption related to the former structure of the entity making the transfer." *Id.*

The Trustee's pleading on reasonably equivalent value lacks this specificity, or any at all. As he would have it, *no* lending to PettersCB could have furnished a platform for a corresponding receipt of value when it repaid the debt later: OppFinLLC's original lending to PettersCB was worthless, because it only prolonged an inherently unprofitable operation in PettersCB, not sustainable within its own confines. There is only one fact-allegation more specific than that, and it is barely so: the merchandising of Polaroid-branded goods and the operation of PettersCB were maintained only as a front, to bolster a pretense of high overall success for Tom Petters personally so he could draw other investors into the PCI-centered scheme.

Even when the Trustee originally advanced this notion, it overreached the logic of the Ponzi scheme presumption under the precedent he used. In the original federal framing, only payments made by a perpetrator "in furtherance of the scheme," are subject to avoidance. *Finn*, 860 N.W.2d at 645 (citing *Perkins v. Haines*, 661 F.3d 623, 626 (11th Cir.2011), and quoting the noted phrase). Through his Second Amended Complaint, the Trustee seeks to avoid payments of money generated from actual sales of concrete goods, consummated consistently with the original contractual expectations for OppFinLLC's lending to PettersCB.

But, just as the underlying genuine loan-participation transactions did for the perpetrator in *Finn*, the actual deals pleaded by the Trustee provided PettersCB with a "legitimate source of earnings" with which to pay OppFinLLC, on debt that had been taken on to finance those very deals. *Cf.* 860 N.W.2d at 652 (recognizing presence of real-life, genuine business deals in relevant transactional history there, as reason to reject all three parts of Ponzi scheme presumption). Even though an active Ponzi scheme was surging in other parts of Tom Petters's enterprise structure, the Second Amended Complaint stretched too far in the way it would classify its real-goods-real-proceeds events to meet the causality-based requirement of the federal presumption, a "furtherance" of a Ponzi scheme. *See In re Petters Co., Inc.*, 495 B.R. at 908 (emphasizing centrality of this requirement in presumption's defensibility).[34]

---

**34.** This prompts an observation, as superfluous as it may be: the *Finn* court could have left the federally-evolved presumption alone, assuming its viability for the sake of analysis. This still would have allowed the affirmance of the trial court's outcomes on the ground that the real-deals-real-proceeds scenarios before it did not "further[] ... the scheme" there. The basic facts cited in *Finn* could not support a finding that the perpetrator's scheme was furthered in any concrete way from the engagement in the legitimate deals there. There was one minor option to support such a conclusion—a possible (and only residual) benefit from a deal-specific, limited amount of profit remaining in the commingled bank account of *Finn*'s perpetrator, which then could be used to further the scheme. Clearly, the *Finn* court did not think this would be enough; it did not even men-

. One can envision several ways in which Tom Petters could have tied PettersCB's operation into his main scheme. The Trustee does not plead a one of them. He does not allege that PettersCB was part of the central entity-structure through which Tom Petters carried on his scheme under the pretense of mass engagement in "diverting" transactions. The transactions pleaded here were very different in nature from those that Tom Petters pretensed for the scheme; the Trustee admits that Tom Petters really did act through PettersCB to procure the manufacture of goods for Polaroid branding, and then sold them to real customers. As described in pleadings for the clawback litigation in the *Petters Company, Inc.* cases, the engine of the PCI-centered scheme was very different: using one or several entities to ostensibly serve as a factor between a holder of preexisting goods and an end-customer, with the Petters entity ostensibly acquiring the goods using borrowed monies and then "diverting" them to its pretensed customer.

On a more limited scale, the Trustee does not allege that any net profit from PettersCB's transactions was transferred to the PCI structure to offset an operational insolvency there. The pleaded allegation actually cuts to the opposite sort of flow, that "[a]t the times of the Transfers, [PettersCB] was capitalized and propped up with funds obtained by fraud through the Ponzi scheme." Second Amended Complaint, ¶ 70; also, Second Amended Complaint, ¶ 57.

In relation to the central scheme within Tom Petters's organization, only one role for PettersCB is pleaded in the Second Amended Complaint, or can be reasonably inferred from it: "to give [Tom Petters's] business activities," "himself and his organization," a "false air" or a "false appearance" of "legitimacy." Second Amended Complaint, ¶¶ 24 and 42. But otherwise the Second Amended Complaint depicts PettersCB as standing separately, with its transactions and transfers divorced structurally and operationally from the central churn of money within the Petters scheme.[35] In the context of the Trustee's other fact-pleading, such a role is far too intangible to recognize as a *function* "in furtherance of" a Ponzi scheme, for the activation of the federally-evolved presumption.[36]

tion it. As to the rest, the genuine cash proceeds would have been traceable right through the commingled account, to the repayment of the investors in the deals that generated the proceeds. (Remember, the perpetrator in *Finn* was acting only as a *servicer* and agent for the transferee-defendants, with an obligation to promptly forward all payments received from the note obligor.) There was no allegation of temporary diversion of funds toward repayment of other, defrauded investors—let alone a permanent conversion as invariably occurs when a Ponzi scheme is prolonged through the rolling fraud of the classic structure.

35. At one point (and only one), the Trustee alleges that PettersCB "was part of the Ponzi scheme and destined to fail with the Ponzi scheme, and . . . the Transfers furthered, and were intended to further, the Ponzi scheme."

Second Amended Complaint, ¶ 55. He does not allege one thing to answer the crucial question, "How?" The allegation is entirely conclusory, and thus does not suffice under Rule 12(b)(6).

36. The pleaded situation here is different from the relationships between perpetrator and transfer-recipient that could entail a "luster factor" palpable enough to find "furtherance" in the making of certain transfers to non-investors. See *In re Petters Co., Inc.*, 532 B.R. at 104–105 (charity-recipients of large, well-publicized donations); *In re Petters Co., Inc.*, 495 B.R. at 910–911 (ditto, plus employee-recipients of bonuses derived from ostensible, publicly-touted success of purveyor's business). The most important would be the proximate connection in these other situations, between the perpetrator-entity and the

So the Second Amended Complaint was factually deficient under the very substantive principles on which the Trustee relied. The pleaded factual basis for an actual-fraud theory under MUFTA necessarily relied on the federally-developed presumption. Second Amended Complaint, ¶¶ 55–57. But the Trustee did not plead facts to link PettersCB's transacting into the only real Ponzi scheme he identified, that within PCI's operations. To the extent he tried to make out constructive fraud by a separate inference or presumption of no reasonably equivalent value to PettersCB from the repayments, the federal case law required the factual presence of a de facto gap in a chain of transactions—the absence of real-life, underlying business or investments, opportunities which the Ponzi-scheme purveyor was ostensibly promoting by its pretenses. In the federal case law's analysis, the exploitation of successive lies between two generations of investors justifies an equitable override of the finality of past repayments. *In re Petters Co., Inc.*, 499 B.R. at 355–359 (discussing analysis of *Scholes v. Lehmann*, 56 F.3d at 756–758 and its recognition of the rolling fraud within a Ponzi scheme's operation). But the Second Amended Complaint pleads no such vacuum-pocket within PettersCB's business operations. To opposite effect, it pleads that PettersCB did real-life deals using the funding provided by the Opportunity Finance Entity–Defendants. The Trustee does not plead a factual basis for a finding of no reasonably equivalent value, even under the federal rules of decision.

That gave enough reason to reject the Trustee's pleading on its substance under MUFTA, on its original legal sensibility.

In any event, *Finn* conclusively bars the only theories that could be underlying the Trustee's pleading under MUFTA, for both of its variants.

As to MUFTA's actual-fraud variant, the Trustee seems to rely in his pleading on a presumption of fraudulent intent, triggered by Tom Petters's *concurrent* involvement in a Ponzi scheme—not only with other parties but through entirely different entities within his enterprise structure. Second Amended Complaint, ¶¶ 55–57. *Finn*'s summary of the presumption of intent accurately describes the Trustee's theory on intent here: Tom Petters, as the perpetrator of a Ponzi scheme, "invariably intend[ed] to cheat all investors" he induced, no matter what the nature of their deals, and hence any and all transfers he made to any and all investors were "made with fraudulent intent," no matter their source. 860 N.W.2d at 647. Thus, as the Trustee pleads, he would be entitled to a broad-brushed presumption of such intent for all payments that PettersCB funded for the satisfaction of OppFinLLC's lending to PettersCB. But *Finn* rejects such a presumption, to the extent it would apply to every single transfer of property made by a transferor that was concurrently perpetrating a Ponzi scheme. 860 N.W.2d at 647–648.

The Trustee does try to plead the alternate factual basis for a finding of fraudulent intent, the badges-based approach of Minn.Stat. § 513.44(b) (2014). Second Amended Complaint, ¶¶ 28–35. Intent to defraud investor-creditors within the broader context of a Ponzi scheme may be proven in this way. *Ritchie Capital Mgmt., LLC v. Stoebner*, 779 F.3d at 862–

---

recipient: a direct and reinforcing reflection on the perpetrator-transferor. This contrasts with the indirect link here, seguing through the person and personality of Tom Petters as it would have to. The ostensible furnishing of luster from Tom Petters's early transactions in Polaroid-branding is too attenuated to defensibly classify a payment on the transaction as having been "in furtherance" of his main scheme.

866.[37] However, all of the Trustee's pleaded facts go to the way in which *PCI* was operated, to the detriment of *its own* lenders and investors. Not a single pleaded fact goes to how *PettersCB* would have paid OppFinLLC with a contemporaneous intent to hinder, delay, or defraud *its own* creditors. The Trustee relies solely on an inapplicable presumption of all-encompassing fraudulent intent. Apparently he would have that plus badges-based fact-finding stretched beyond entity-boundaries and resonant with alleged fraud on creditors of other entities. That goes far outside MUFTA's contemplation, and it has to fail. This means that the Trustee does not plead a claim for actually-fraudulent transfer on which relief may be granted against the Opportunity Finance defendants under Minn.Stat. § 513.44(a)(1).

The reasons are somewhat more involved for MUFTA's constructive-fraud variant, but *Finn* defeats the Trustee's pleading under that as well. The Trustee would have it presumed that PettersCB or PettersCB Funding did not receive reasonably equivalent value for the monies they directed to satisfy OppFinLLC. It is not clear whether he directs this to the full amount paid. It is safe to assume that he would avoid the payments at least to the extent of their ostensible interest-component, under rulings extant when he made his second amendment. *In re Petters Co., Inc.*, 499 B.R. at 359–363.

The Trustee asserts the benefit of this presumption, on his summary assertion that "[d]uring the time at issue ... (2003 through 2005), Tom Petters used [PettersCB] to further his Ponzi scheme," as

"one component of the larger Ponzi structure ... used ... to give his business activities a false air of legitimacy and to extend the duration of the Ponzi scheme." Second Amended Complaint, ¶ 24. Yet again, in the same breath the Trustee admits that PettersCB "actually purchased, warehoused, and sold" real Polaroid-branded goods. *Id.* There is a gratuitous accusation that Tom Petters "used [PettersCB] to launder money from his Ponzi scheme." Second Amended Complaint, ¶ 25. That allegation is isolated, opaque, and conclusory. In the same breath, it is pled that Tom Petters diverted money generated from the main churn of his scheme *into* PettersCB, "to run [it] and prop up its losses." *Id.* This statement is no less conclusory. But more to the fact, it does not plausibly support the notion of Tom Petters using the operation of PettersCB to further the scheme he was carrying on through other entities and with other investors. The money would be running the wrong way. He does not plead that any funds sourced in OppFinLLC were diverted away from the contractually-contemplated transactions in Polaroid-branded goods, to the satisfaction of previously-defrauded investors into the main scheme or otherwise. And there is the more general pleading that would have PettersCB incorporated into the main operation of the PCI-based scheme. Second Amended Complaint ¶¶ 55–57. That has been rejected already due to its conclusory character, devoid of plausible supporting fact-content.

To the extent that the Trustee relies on the component presumption of no reason-

---

37. The Eighth Circuit issued *Ritchie Capital Mgmt., LLC v. Stoebner* after *Finn* was rendered, and expressly directed its analysis to the badges-based approach in mind of *Finn*'s rulings on state law. 779 F.3d at 862 and n. 6. *Finn* itself seemingly countenances that a badges-based case for actual fraudulent intent

may be adequately pled on sufficiently-detailed allegations that the subject transfers were made within a Ponzi scheme's operation. 860 N.W.2d at 654 (affirming ruling to this effect made by Minnesota Court of Appeals).

ably equivalent value alone, *Finn* sinks that legal theory of recovery. A complaint fails under Rule 12(b)(6) as to Minn. Stat. §§ 513.44(a)(2) and 513.45(a) (2014) where the plaintiff relies solely on the transferor's separate "engage[ment] in a Ponzi scheme" involving transactions similar to the one for which the subject transfer was made, to compel a finding of no reasonably equivalent value. 860 N.W.2d at 654. This follows from *Finn*'s two earlier pronouncements. First, this presumption "eliminates *the possibility* that an investor has a legally-enforceable claim against the debtor[-perpetrator] based on the investment contract," 860 N.W.2d at 651 (emphasis added). Second, the presumption's shortcut defeats the purpose of a transfer-specific analysis, 860 N.W.2d at 650, under which MUFTA would consider the satisfaction of an honestly-contracted antecedent debt as value which would be considered reasonably-equivalent if the abatement went dollar-for-dollar, 860 N.W.2d at 654.[38]

*Finn*'s major ruling was its rejection of the Ponzi scheme presumption for MUFTA. But the opinion went further than that, to treat at least one aspect of the substantive reach of MUFTA, in clawback litigation. Outside the lawsuit at bar, there is currently a pointed and bona fide controversy over the full reach of *Finn*

into the main churn of a Ponzi scheme.[39] At this point, it can be said that *Finn* settled one thing for the application of MUFTA's constructive-fraud remedies to transactional history that features the presence of a Ponzi scheme perpetrated by the transferor. On the specific facts before it, the *Finn* court held that the debtor-transferor does receive reasonably equivalent value for the repayment in full of debt owing per contractual terms to an investor that had funded a real-life, bona fide, closed, and consummated business transaction—despite the fact that the debtor-transferor was perpetrating an operating Ponzi scheme to defraud *other* investors through the same type of transaction. 860 N.W.2d at 655 (stating that transferee claimed reasonably equivalent "value . . . [in] the satisfaction of the debt owed by [the debtor-perpetrator] under the participation agreement between the parties," and emphasizing that "the [particular] loan was real and not oversold").[40] This applies to the repayment of both principal and interest. 860 N.W.2d at 655–656 (holding that "the satisfaction of . . . [the] antecedent debt constituted 'value' under MUFTA," and affirming trial court's finding of reasonable equivalence on undisputed proof that interest rate was commercially reasonable).[41]

---

**38.** This was the ruling as to the *Finn* receiver-plaintiff's action against the so-called "Respondent Banks," who had challenged his pleaded case on motions for dismissal. *Finn* really did not address the essential statutory requirement of reasonable equivalence; but it is self-evident that a dollar-for-dollar reduction satisfies it. *In re Duke and King Acquisition Corp.*, 508 B.R. 107, 146 (Bankr.D.Minn. 2014).

**39.** This issue is currently under submission in the litigation docket for the *Petters Company, Inc.* cases.

**40.** This was the ruling as to the *Finn* receiver-plaintiff's action against Alliance Bank, which

had challenged the sufficiency of the receiver's case on a motion for summary judgment.

**41.** Under the federal courts' development of fraudulent-transfer analysis and the Ponzi scheme presumption, the repayment of principal does furnish reasonably equivalent value to the perpetrator. However, it is not clear from the Minnesota Supreme Court's opinion in *Finn* whether the plaintiff conceded this. The trial court in *Finn* seemed to have used that substantive rule in granting judgment to the receiver for the recovery of interest. The principle applied was that "any payments received in excess of . . . principal investment were wanting in reasonably equivalent value to the transferor. 860 N.W.2d at 655.

So in summary of this central substantive holding from *Finn*, the factual, historical presence of a real-life deal for the original investment defeats a clawback plaintiff's prima facie case on constructive fraud—by depriving the plaintiff of an essential element of its case under Minn. Stat. § 513.44 (2014). 860 N.W.2d at 655.[42]

Here, when the Trustee pleads as historical fact the transactional staging toward the transfers he would avoid, he does not identify anything *but* real-life transactions. All of them were financed by money generated by OppFinLLC. He does not plead any facts to directly place any transaction into the layered lies of the main churn of Tom Petters's Ponzi scheme—which involved wholly fictitious transactions of a different nature. At most, he suggests that the money from OppFinLLC and the real-goods transactions was augmented with outside funds to meet the operational needs of PettersCB. Second Amended Complaint, ¶ 70. ("At the times of the Transfers, [PettersCB] was capitalized and propped up with funds obtained by fraud through the Ponzi scheme.")

This, too, is conclusory and unilluminating—certainly not plausible support for a theory of liability under a complicated statute. Also, it is inappropriately colloquial— "propped up" is neither a legalism nor a legal term of art, and the gist of the accusation is opaque. At most, the epithet suggests that the funds traceable to and from OppFinLLC and through the real-goods transactions were commingled with some funds funneled out of the PCI-centered scheme, toward some undisclosed use by PettersCB. Under *Finn*, any such commingling is irrelevant. The Ponzi scheme perpetrator there commingled honestly-used funds with dishonestly-obtained funds, 860 N.W.2d at 642; but *Finn* does not recognize commingling standing alone as evidence of a lack of reasonably equivalent value to the transferor, for payment made out of the commingled pool.

*Finn* was issued after these motions were submitted. As binding precedent, *Finn* unquestionably speaks to one scenario out of a failed Ponzi scheme; and it rejects MUFTA's application to it. That very fact-pattern is the one that appears on the face of the Trustee's pleading against the Opportunity Finance defendants. A complaint based solely on that does not plausibly lay out a claim on which relief may be granted.

There is no way that the Trustee could replead an alternate set of facts to counter this effect of *Finn*, without indefensibly contradicting the factual premises for his present theory of recovery. It would be futile to grant leave to replead on the merits under MUFTA.[43] Dismissal with prejudice of his MUFTA-based claims against the Opportunity Finance defendants is thus merited under this alternate ground.

## IV.   Liability of DZ Bank

In the wake of that analysis, there is virtually nothing to defend the adequacy of the Trustee's pleading against DZ Bank. He does not plead any facts to make out DZ Bank as an initial transferee of the payments made by PettersCB. In fact,

---

**42.** It also satisfies half of the elements of the affirmative defense under Minn.Stat. § 513.48(a) (2014), the receipt by a transferee in good faith and for reasonably equivalent value. That alternate significance of reasonably equivalent value is not implicated by these motions.

**43.** Again, this all assumes that the Trustee's pleading could somehow be tweaked to establish his standing to sue under MUFTA and § 544(b).

that would run against the whole sense of his involved pleading about the structuring of the transactions—specifically the presence of one or possibly two SPE-intermediaries in the chain of transferors and transferees under "the bankruptcy remote" contractual provisions for lending and repayment.[44] He certainly does not allege that those presences were leaped over somehow to direct funds immediately to DZ Bank. And if the Trustee had pled DZ Bank's direct receipt of payments from funds generated by PettersCB, the rulings made on standing and the merits under MUFTA would require the very same outcome for DZ Bank as for the Opportunity Finance defendants.

From the terse and opaque pleading, it is more likely that DZ Bank is sued as a subsequent transferee. The failure of the Trustee's action against the Opportunity Finance defendants bars him from recovering from DZ Bank. A trustee may recover from "any immediate or mediate transferee of [an] initial transferee." *In re Sherman*, 67 F.3d 1348, 1356 (8th Cir.1995). However, it is self-evident from the face of the statute that a trustee may recover against an immediate or mediate transferee only "to the extent that [the] transfer is avoided" on its merits, i.e. only if the transfer is avoidable *as to* the initial transferee. 11 U.S.C. § 550(a).

Thus, DZ Bank is entitled to the dismissal of the Trustee's complaint, as vaguely-worded and-framed as it is toward that defendant.

## OUTCOME

There is no repair for the fact-pleading in the Trustee's Second Amended Complaint. Due to several serious, fundamental flaws, it fails to plausibly set forth a factual basis on which he could recover on any of his pleaded legal theories against any of the defendants.

## ORDER

IT IS THEREFORE ORDERED that this adversary proceeding is dismissed, in its entirety and with prejudice.

---

44. Per the Second Amended Complaint (and as the Opportunity Finance defendants admit), Defendant Opportunity Finance Securitization II, LLC was set up as a further bankruptcy-remote entity in the chain, for receipt of lent money directly from DZ Bank. Second Amended Complaint, ¶¶ 6 and 14; Opportunity Finance Motion for Dismissal [Dkt. No. 49], 4–5. Apparently the Sabes Family Defendants thought that one bankruptcy-remote entity was not enough and two would be better.